ATTORNEY FOR APPELLANT ATTORNEYS FOR APPELLEE

David A. Brooks Jeffrey A. Modisett

Lyons, Sullivan & Brooks Attorney General of Indiana

Valparaiso, Indiana

Janet Brown Mallett

Deputy Attorney General

Indianapolis, Indiana

In The

INDIANA SUPREME COURT

ALLEN GARLAND )

Defendant-Appellant, ) 

)

v. ) 75S00-9704-CR-00229

) 

STATE OF INDIANA, )

Plaintiff-Appellee. )

                          ________________________________________________  

APPEAL FROM STARKE CIRCUIT COURT

The Honorable David P. Matsey, Judge

Cause No. 75C01-9602-CF-00010

                        _________________________________________________

On Direct Appeal

November 19, 1999

DICKSON, Justice

The defendant, Allen Garland, appeals from his conviction for the January 24, 1996, murder
(footnote: 1) of his father, David Garland.

The defendant claims that the evidence was insufficient to prove that he either shot his father or aided another in shooting his father.
(footnote: 2)  The State asserts that the defendant's own statement shows his complicity, citing the defendant's descriptions of conversations with substance abuse counselor James Lloyd regarding the intended killing, the defendant's failure to warn his father, his presence and conduct at the scene of the murder, and his subsequent concerns about an alibi to give police.  

In reviewing a claim of insufficient evidence, we neither reweigh the evidence nor judge the credibility of witnesses; rather, we consider only the evidence that supports the verdict and the resulting reasonable inferences; and we will affirm if a reasonable jury could find the defendant guilty beyond a reasonable doubt.  
Riley v. State
, 711 N.E.2d 489, 494 (Ind. 1999); 
Jackson v. State
, 709 N.E.2d 326, 329 (Ind. 1999).  An appellate claim of insufficient evidence will prevail if, considering the probative evidence and reasonable inferences that support the judgment, and without weighing evidence or assessing witness credibility, we conclude that a reasonable trier of fact could not find the defendant guilty beyond a reasonable doubt.  
Case v. State
, 458 N.E.2d 223, 226 (Ind. 1984); 
Loyd v. State
, 272 Ind. 404, 407, 398 N.E.2d 1260, 1264 (1980).

To prove murder, the State must show that the defendant knowingly or intentionally killed another human being.  
Ind. Code
 § 35-42-1-1 (1993).  Under the accomplice liability statute, a person "who knowingly or intentionally aids, induces, or causes another person to commit an offense commits that offense."  
Ind. Code
 § 35-41-2-4 (1993).
(footnote: 3)  Factors considered by the fact-finder to determine whether a defendant aided another in the commission of a crime include:  "'(1) presence at the scene of the crime, (2) companionship with another engaged in a crime, (3) failure to oppose the commission of the crime, and (4) the course of conduct before, during, and after the occurrence of the crime.'"  
Edgecomb v. State
, 673 N.E.2d 1185, 1193 (Ind. 1996) (quoting 
Johnson v. State
, 490 N.E.2d 333, 334 (Ind. 1986)).  While the defendant's presence during the commission of the crime or his failure to oppose the crime are, by themselves, insufficient to establish accomplice liability, the jury may consider them along with other facts and circumstances tending to show participation.  
Burkes v. State
, 445 N.E.2d 983, 987 (Ind. 1983); 
Harris v. State
, 425 N.E.2d 154, 156 (Ind. 1981).  

In this case, the defendant, who was 23 or 24 years old at the time of the offense,
(footnote: 4) did not testify at trial.  The evidence most favorable to the judgment derives almost exclusively from his videotaped interview with police.  Prior to the murder, pursuant to the disposition ordered in an earlier case charging the defendant with possession of marijuana, he began a series of sessions with Lloyd, a substance abuse counselor.  He was accompanied by his mother, Sharon Garland, and, over the course of time, Sharon and Lloyd also developed a relationship, which continued after the defendant's counseling ended.  It is clear from the defendant's description of his parents' marriage that it was troubled.  He reported frequent arguments and accusations of infidelity.  According to the defendant, his father was aware of Sharon's frequent counseling and friendship with Lloyd, but did not suspect a sexual relationship.  A week before the murder, Lloyd advised the defendant that the defendant's father, David, had molested a boy family member.  Describing his conversation with Lloyd, the defendant told police:

And he [Lloyd] goes, well, your dad should . . . something should be done with your dad.  And I said, why doesn't my mom just leave him? . . .  And he kept telling us . . . something should be done.  And I said yeah, there should, you know, there should be something done. . . .  And I didn't, you know, he goes, well, the son-of-a-bitch should be killed.  And I said well, yeah, if that's what it takes, that's what it takes.  I said I don't know.  And I don't know.  

Record at 7212-13.  Later in the interview, when again asked regarding this discussion, the defendant claimed that Lloyd said, "[M]y dad should be dead.  I remember him saying, that all child molesters have a price to pay."  Record at 7316.  At another point in the police interview, the defendant, describing this conversation, reported that Lloyd said, "[C]hild molesters should be killed, and I said yeah, I said, that's true.  I said somethin' should be done with everybody."  Record at 7301.  The defendant also spoke about a conversation Lloyd had with the defendant and his mother during an automobile ride the next day: 

So we took a ride around the lake.  And I drove.  Mom let me drive her car over there.  And we were driving around.  And as I started to say, he said, well, what do, what do you think that should be done with your dad?  And I said, James, I really don't know what should be done. . . .

He kept on telling us, or told me, not to say anything.  And if I do, something was gonna happen. . . .  And he said well, I have an appointment with your dad, and he said that I need somebody to be like the off man, like in the back seat, get you dad's, you know, like, not aware of what he was gonna do and probably, you know, shoot him.  And he was saying that he was gonna get an unmarked gun from . . . and everything was going to be taken care of.  And I said, where are you going to get this gun?  I said this ain't even a well thought-out plan. I said, have you flipped fucking out?  This is all fucking crazy.  And it is.  It was all crazy.

Record at 7215-17.  When the interviewing officer asked him if Lloyd wanted the defendant to participate in the shooting, he answered: 

Yeah.  And I told him I couldn't. . . .  He said beforehand, though, before that, I said, he says, that he was gonna make it look like a burglary, or like somebody came in the house and was trying to steal something, if he could not get somebody to go with him and ride, and I said, what are you supposed to do with the body even, James?  When you shoot, there's gonna be blood all over the car.  What was he, you know, is he crazy?  And then he goes, I said, well, what, what, where am I supposed to be?  He said, well, I'll set you up in the Culver Cove.  And I said, and he said well, I said what if the cops ask me questions about it?  It's going to be looking like I did it.  And he was like just say that you were with somebody, like one of your lovers or something from the past.  And I said no, this is all crazy.  I said I cannot do this. . . .  [H]e said, well, if you don't want any part of it, just leave, on my voice mail, just say no.  And I said James, I said I can't do this. . . .

Record at 7217-18.  
See also
 Record at 7320-21.  After further questioning, the defendant continued:

And so we just sat there for awhile, and he kept on saying, well, if you don't want no part of it, just call the voice mail and say no.  And I said well, it just doesn't all make sense.  I said none of this all makes sense.  I said, I think it's all fucking crazy.  I said you just do what you want to do, I said, because I'm not going to have no part of it.  He goes, well, no, if you . . . if you can't handle it, just don't ever repeat this to anybody, or you're gonna be done in just like your dad is gonna be done in. And I said all right.  I said, and he said, all right, you swear that you won't say anything?  And I said, yeah, I swear.  And, and I was scared of him already.  

Record at 7219.  Later in the defendant's police interview, he again described this conversation, stating in part:

He said well, if you want a part of it, you can be a part of it.  I just thought that you would want to be a part of it because of the fact that he, [Lloyd], I think, thought that my dad molested me.  My dad didn't molest me.  My dad never touched me.  Just, you know, hit me.  You know?  But he never molested me.  Whatsoever. . . .  And he [Lloyd] kept on saying well, if you don't want no part of it, don't say anything about it, or you can, I have brothers, it will get back to me if you say anything.  Then I'll do you in and do your family in, just like your dad's going to be done in.  And, he said why don't you want a part of it?  And I kept on saying, I don't know.  I said I don't know.  I said you are flipping me out.  I said, this is crazy.  I said can't you think of a better plan to do anything with? . . .

And so . . . he kept on saying well, if you don't want a part of it, just leave it on my voice mail, just say no. . . .  And then we got back to the office and we sat there, and he knew that I was like really scared and nervous about the whole deal, because I was shakin' and, he said just, don't even leave a message on my thing, he said, I'll take care of it myself. 

Record at 7321-23.  A friend of the defendant, Melissa Collins Boller, testified that, during the week before the murder, he told her that Lloyd wanted to kill his father.  Record at 3110.  She further testified that the defendant later reported a further conversation with Lloyd:  "Allen [the defendant] had told me that he had went to see James [Lloyd] and that, uh, he was, that James had told him, had asked Allen, well, do you wanna be there when I kill your dad?"  Record at 3119.  Asked what the defendant replied, she testified:  

Allen said, "no."  He wanted nothing to do with any of this.  He, James had said something to Allen to the effect of, "well, we might need you there so he'll look another way and we could shoot him," or "do you wanna, wanna watch as we kill him?"  And Allen was very visibly upset and he was like, he was telling me that he had told him, "no, I don't want nothing to do with this.  I want out of it.  I want out of this completely.  I don't want nothing to, I don't wanna talk about this anymore. I want nothing at all to do with you." 

 

Record at 3119.  

According to the defendant's statement to police, on the day of the murder, the defendant visited Lloyd's office regarding a financial dispute.  In their ensuing conversation, the defendant said to Lloyd: "[Y]ou're so scared to do anything about my mom and dad's relationship."  Record at 7232.  Describing Lloyd's reply, the defendant said, "And he [Lloyd] said that he was set up Friday night because he, he went over there to do the job, or do my dad in, he said, and there was cops all over the place."  Record at 7233.  The defendant admitted that he did not report Lloyd's threats or warn his father.  Later that evening, the defendant was at home with his mother and father, when he saw Lloyd drive up.  The defendant described the ensuing events in his police interview, which follows in pertinent part: 

And so I went out and I told Mom, I said Mom, I said James is here.  And it was loud enough that my dad could hear, and Mom goes, well, I'll go out there and see what he wants.  So Mom went out on the porch. . . .  And Dad goes, well, go out there and see what's goin' on, because Mom was out there like two or, two or three minutes, and it was cold.  And she didn't have anything on.  And I don't know why they didn't come in.  And then I walked out there.  I had the door open. And, Mom was standing here (indicating), and James was here (indicating), and I was by the door.  James goes, hi, son. . . .  And then he goes, if you don't want any part of this, he says, stay outside.  And, I still had the door open, and when he said that, he started walkin' in, and he took the gun out, and it was in the palm of his hand, and I could still see it because it's not very big and it was silver; it was a little silver gun.  And he walked in, and I don't know if Mom walked in before him or Mom walked in after him.  And I, I set out here on the . . . or stood out here on the porch.  But it just happened so quick.  I mean, as soon as he walked in, he had the gun, he pulled it up, and it was right here by the counter.  I just saw the hand go like that (indicating), and just wham.  And I couldn't see because of the swinging door came back out, and I just heard a boom and I heard my dad fall.  I thought it was my dad.  I didn't know if it was my dad or my mom.  It was like a big boom.  And, I heard another shot, and a couple more.  And it's just like boom, boom, boom, you know.  And I opened up the glass door, and I kicked the one and I saw my mom finally, and she was over here (indicating) and she was getting' her purse and her coat.  And I said Mom, I said, hurry the fuck up.  I said this is just fucking crazy.  I said, I'm out of here.  I didn't know what to do.  I didn't know to run, I didn't know, I, Dawn was supposed to be there, I didn't know what to do.  I didn't know.  And [Mom] was tying her shoes or puttin' on her shoes and slippin' them on.  And I said, hurry the fuck up.  I said this is crazy.  I said this is all fuckin' crazy.  And, she came out and James came by, like comin' this way (indicating), and I saw him.  He was like, make sure that that front door is locked.  The front door always stays locked, you know.  You don't have to, all you got to do is pull it, you know.  And he said make sure it's closed.  And I, I don't remember if I had the door or the glass door, and I was still on the porch.  And, we went outside, me and Mom did.  And she couldn't find the keys.  And I said Mom, I said you got to hurry up, I said, Dawn is supposed to be here.  I said this is crazy.  I said hurry up, just hurry up.  And she was diggin' through her purse and I just grabbed ahold of the purse, and the doors were locked on the car, and I dumped out her purse, and she had her hands like this (indicating), and stuff in her hands, it was falling on the ground.  And, and she got the keys.  And I said, make sure there ain't nothing on the ground.  

Record at 7237-39.  
See also
 Record at 7246-47, 7259, 7267-7279.  The defendant and his mother initially concealed their knowledge about the murder from various persons.  In his recorded interview, the defendant told police of an incident that occurred two days after the murder when he and his mother encountered Lloyd and went outside to talk.  The defendant stated that, after asking them about their initial interviews with police, Lloyd stated:  "[T]hey don't have nothin'. . . .  And he goes, if they ask you any more questions, he says, just tell them your dad passed away and you don't have to answer any more fuckin' questions without an attorney present."  Record at 7253.  It was not until five months after the murder that the defendant revealed to police his knowledge of David's murder.  

Very little additional evidence was presented regarding the murder incident.  James Lloyd did not testify.  Sharon Garland testified, but her testimony did not provide evidence favorable to the judgment convicting the defendant.  Evidence was presented through the defendant's recorded interview and through the testimony of Melissa Collins Boller, the defendant's older brother, and the older brother's wife regarding their visit to the defendant at jail before trial.  On that occasion, the defendant briefly pressed a yellow legal pad with handwriting on it against the window while they communicated by telephone.  Boller testified:

On it, it said that, uh, it talked about the night that Dave was killed.  His dad was killed.  He was walking down the porch. . . .  Allen was walking down the porch steps.  James was there.  Allen asked James, it said.  This is what the letter said, "Asked James, like, what the Hell are you doing here?"  And James showed him, opened up his coat or something and showed him a gun.  

Record at 3167-68.  She remembered little else of the words on the legal pad.  

From our review of the probative evidence and reasonable inferences that support the judgment, and without weighing evidence or assessing witness credibility, we conclude that a reasonable trier of fact could not find, beyond a reasonable doubt, that the defendant was guilty of knowingly or intentionally aiding, inducing, or causing another person to commit murder.  Considering the defendant's conduct before, during, and after the occurrence of the crime, we recognize that the defendant was aware of Lloyd's expressed desire to kill the defendant's father, that he did not report it to police or warn his father, that he was present near the scene of the murder, that he assisted his mother in leaving the scene and concealing potential evidence, and that he initially lied to police regarding his knowledge of the incident.  Our finding of insufficient evidence substantially results from the absence of evidence demonstrating that the defendant took any step to aid, induce, or cause the crime, even though the defendant may have known that Lloyd intended to commit murder, and took no action to prevent it.  

Although we find that the evidence is insufficient to support the defendant's conviction on Count I, charging murder, we note that the jury also found him guilty on Count II, charging conspiracy to commit murder, and Count III, charging assisting a criminal.  The trial court, however, did not enter a judgment of conviction on either of these counts.  For the reasons discussed above, we find no evidence to establish that the defendant agreed with Lloyd or Sharon to commit murder and thus conclude that the evidence is also insufficient to support a conviction on the conspiracy count.

However, as to Count III, charging the crime of assisting a criminal,
(footnote: 5) we find the evidence is sufficient to convict.  A reasonable jury could have found, beyond a reasonable doubt, that the defendant was not related to Lloyd and that he harbored, concealed, or otherwise assisted Lloyd with the intent to hinder his apprehension or punishment after Lloyd had committed the crime of murder or the crime of conspiracy to commit murder.  

The defendant also argues on appeal that the trial court erred in granting the State's motion to join the defendant's trial with his mother's.  However, he concedes that he did not object to this at trial.  Thus, the merits of this claim are forfeited.  
Stevens v. State
, 691 N.E.2d 412, 420 (Ind. 1997).  The defendant further challenges his conviction on grounds of ineffective assistance of counsel.  Because we are reversing the judgment of the trial court, this issue is no longer presented.

Conclusion

The conviction and sentence for murder is reversed, and this cause is remanded to the trial court to enter judgment and sentence on Count III, assisting a criminal.

SHEPARD, C.J., and SULLIVAN and BOEHM, JJ., concur.  

FOOTNOTES
1:  
Ind. Code
 § 35-42-1-1 (1993).

2:  The jury found the defendant guilty of murder, conspiracy to commit murder, and assisting a criminal.  Noting constitutional considerations regarding double jeopardy, the trial court entered judgment only on Count I, charging murder (imposing a presumptive fifty-five year sentence), and the court declined to enter judgment, conviction, or sentence as to Count II, conspiracy to commit murder, a class A felony, and Count III, assisting a criminal, a class C felony.  

3:  Such criminal liability may result even if the other person has not been prosecuted for the offense, has not been convicted of the offense, or has been acquitted of the offense.  
Ind. Code
 § 35-41-2-4.

4:  The murder occurred on January 24, 1996.  The defendant's mother testified that he was born July 10, 1972.  Record at 3523.  The trial court's judgment and sentencing order dated December 20, 1996, states that "Defendant Allen Garland is 23 years of age."  Record at 755.

5:  Indiana Code section 35-44-3-2 provides:

A person not standing in the relation of parent, child, or spouse to another person who has committed a crime or is a fugitive from justice who, with intent to hinder the apprehension or punishment of the other person, harbors, conceals, or otherwise assists the person commits assisting a criminal, a Class A misdemeanor.  However, the offense is:  (1) a Class D felony if the person assisted has committed a Class B, Class C, or Class D felony; and (2) a Class C felony if the person assisted has committed murder or a Class A felony, or if the assistance was providing a deadly weapon.