**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEY FOR APPELLANT:

**DAVID A. SMITH**
McIntyre & Smith
Bedford, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**GEORGE P. SHERMAN**
Deputy Attorney General
Indianapolis, Indiana



FILED

May 16 2013, 9:12 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

TAMMY SPENGLER,                    )
                                   )
    Appellant-Defendant,            )
                                   )
        vs.                  )    No. 88A01-1207-CR-318
                                   )
STATE OF INDIANA,                  )
                                   )
    Appellee-Plaintiff.             )

APPEAL FROM THE WASHINGTON CIRCUIT COURT
The Honorable Larry W. Medlock, Judge
Cause No. 88C01-1106-MR-419

**May 16, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BRADFORD, Judge**

At some point prior to June 22, 2011, Tammy Spengler and her co-defendant, Timothy Orman, killed her co-defendant's father and uncle and left their bodies to rot in a shed on the property where the killings took place. Approximately one-and-a-half to two weeks later, Spengler admitted to her mother that she had killed two people. At her mother's suggestion, Spengler turned herself into the police, admitted to the killings, and gave police information that led to the discovery of the victims' decomposing bodies. Following trial, Spengler was convicted of murder, aiding in murder, and invasion of property.

On appeal, Spengler contends that the trial court abused its discretion in admitting certain conversations conducted over jailhouse phone lines. Specifically, Spengler claims that her comments made during a conversation between Spengler and her co-defendant amounted to an involuntary statement made during a custodial interrogation and that the admission of a recording of certain conversations between Spengler and her mother was unfairly prejudicial. Spengler also contends that the evidence is insufficient to sustain her convictions and that her 120-year sentence is inappropriate. Concluding that the trial court acted within its discretion in admitting the recordings of Spengler's conversations with her co-defendant and her mother, that the evidence is sufficient to sustain Spengler's convictions, and that Spengler's sentence is not inappropriate, we affirm.

## FACTS AND PROCEDURAL HISTORY

On June 22, 2011, Spengler called her mother, Tammy Thacker, and asked her mother to pick her up at a service station in Floyds Knobs. While Thacker and Spengler were driving back toward Thacker's home in Palmyra, Spengler told Thacker that she had killed

2

"Tim and Bum" a few weeks ago. Tr. Vol. I, p. 142. "Tim and Bum" referred to Timothy M. Orman and Roy Orman, her boyfriend Timothy Orman's[1] father and uncle, respectively. Spengler told Thacker that she and her boyfriend had placed the bodies in a shed on the property where the killings took place. At Thacker's suggestion, Spengler agreed to notify police about the killings and turn herself in. Thacker and Spengler stopped at a gas station in Palmyra, from where Spengler called the police.

After Spengler told the 911 dispatcher that she had killed two people and expressed a desire to turn herself in, Spengler was met at the gas station by multiple police officers. Spengler told the officers that she "killed two people about a week and a half ago[,]" Tr. Vol. I, p. 158, and told the officers where the killings took place as well as the location of the bodies. Spengler told the officers that she placed the bodies in a blue shed and that she did not "know if [she] locked it or not." Tr. Vol. I, p. 175. Spengler was then placed in the back of a police vehicle and read her *Miranda*[2] rights.

Other officers were dispatched to the address given by Spengler as the location of the killings. These officers were subsequently able to locate the victims' bodies in a shed on the property. The victims' bodies were clothed, wrapped in either a sheet or blanket, wrapped in plastic, and stacked one on top of the other. There was a strong stench from the decomposing bodies emanating from the shed. The shed had become overrun by thousands

---

[1] Because one of the victims and Spengler's co-defendant are both named "Timothy," we will refer to Spengler's boyfriend as Spengler's co-defendant throughout this memorandum decision.

[2] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

3

of flies and also had a layer of maggot larva or maggot pupae approximately an inch deep on the floor.

Upon investigating the residence on the property, detectives found numerous guns and large amounts of ammunition. Detectives also found evidence in the form of blood stains, bloody handprints, pieces of flesh, skull fragments, spent shell casings, a black plastic bag with bloody clothing inside, and a pair of sandals. Detectives also noticed that someone had made an attempt to clean up the scene. A hole in an aluminum screen door which appeared to be made by a shotgun blast was covered with tape. There was another hole on the door that seemed to be made by a piece of solid projectile. In addition, interior locks and padlocks appeared to have been forced open.

Investigators recovered lead projectiles from Timothy M. Orman's body, and birdshot[3] was recovered from both Timothy M. Orman's and Roy Orman's bodies. Upon examining the victims' bodies, investigators found that Timothy M. Orman's head was no longer attached to his body and that it was "markedly fragmented due to trauma." Tr. Vol. II, p. 239. Two large pieces of lead projectile were recovered from Timothy M. Orman's arm, a projectile fragment was recovered from his head, and birdshot was found in his chest, hand, and head. In addition, Timothy M. Orman's skull displayed fractures associated with a gunshot wound to the jaw. His skull was in multiple pieces, and certain sections of his skull were never recovered.

Investigators also found that Roy Orman was shot in the face and torso with birdshot.

---

[3] Birdshot is a type of ammunition used in shotguns.

4

Investigators concluded that as many as eight shots could have been fired at the victims. Further investigation revealed that Roy Orman had previously obtained a protective order prohibiting Spengler from being around him or his residence.

On June 24, 2011, the State charged Spengler with two counts of murder, a felony;[4] two counts of aiding murder, a felony;[5] and Class A misdemeanor invasion of privacy.[6] On February 7, 2012, the State moved to amend the charging information and to add a firearm sentencing enhancement. The trial court subsequently granted the State's motions.

Spengler's trial was held on May 9-17, 2012, after which the jury found her guilty of the murder of Timothy M. Orman, aiding in the murders of both Timoth M. Orman and Roy Orman, and invasion of privacy. The trial court conducted a sentencing hearing on June 20, 2012. During this hearing, the trial court merged the aiding in the murder of Timothy M. Orman conviction into the murder conviction and sentenced Spengler to consecutive terms of sixty years each for the murder of Timothy M. Orman and aiding in the murder of Roy Orman. The trial court also sentenced Spengler to a consecutive term of one year for the invasion of privacy conviction, for an aggregate term of one hundred twenty one years. This appeal follows.

## DISCUSSION AND DECISION

On appeal, Spengler contends that the trial court abused its discretion in admitting

---

[4] Ind. Code § 35-42-1-1 (2010).

[5] Ind. Code § 35-42-1-1.

[6] Ind. Code § 35-46-1-15.1 (2010).

5

certain evidence, that the evidence presented by the State at trial was insufficient to sustain her convictions, and that her sentence is inappropriate.

## I. Admission of Evidence

Spengler contends that the trial court abused its discretion in admitting certain evidence at trial. Specifically, Spengler claims that the trial court abused its discretion in admitting a recording of a conversation she had with her co-defendant while both were incarcerated prior to trial. Spengler also claims that the trial court abused its discretion in admitting a recording of certain phone conversations that took place between Spengler and her mother.

> The evidentiary rulings of a trial court are afforded great deference. *Norton v. State*, 785 N.E.2d 625, 629 (Ind. Ct. App. 2003). We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Southern v. State*, 878 N.E.2d 315, 321 (Ind. Ct. App. 2007), *trans. denied* (2008). An abuse of discretion occurs where the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court. *Id.* We will reverse only when a manifest abuse of discretion denies the defendant a fair trial. *Norton*, 785 N.E.2d at 629.

*Marshall v. State*, 893 N.E.2d 1170, 1174 (Ind. Ct. App. 2008). "Moreover, we will sustain the trial court if it can be done on any legal ground apparent in the record." *Jester v. State*, 724 N.E.2d 235, 240 (Ind. 2000).

### A. Spengler's Conversation with Her Co-Defendant

On appeal, Spengler claims that the trial court abused its discretion in admitting a recording of a conversation that took place between Spengler and her co-defendant while both were incarcerated prior to trial. In challenging the admissibility of the recording of this

conversation, Spengler does not claim that she had any expectation of privacy or that any such right was violated when jail officials recorded the conversation between Spengler and her co-defendant. Instead, Spengler argues that the comments she made during the conversation qualified as an involuntary statement given during a custodial interrogation. In support of this argument, Spengler asserts that her co-defendant qualified as a government agent because police arranged for the conversation to take place after her co-defendant offered to make a statement to police about the murders if he were first permitted to speak to Spengler.

"The Sixth Amendment guarantees an accused the right to counsel at all critical stages of prosecution." *Dodson v. State*, 502 N.E.2d 1333, 1336 (Ind. 1987) (citing *United States v. Wade*, 388 U.S. 218 (1967)). The Sixth Amendment is not violated when a passive listener merely collects, but does not induce, incriminating statements. *Hobbs v. State*, 548 N.E.2d 164, 167 (Ind. 1990). However, the Sixth Amendment right to counsel "is violated when the government intentionally creates a situation likely to induce an incriminating statement from a charged defendant in the absence of counsel." *Dodson*, 502 N.E.2d at 1336 (citing *Massiah v. United States*, 377 U.S. 201 (1964)). This can include instances where police promise leniency or hire an inmate to act as an informant in exchange for the inmate revealing incriminating statements made by fellow inmates. *See generally id.* (providing that a statement of a fellow inmate is inadmissible at trial if the fellow inmate was promised any benefit or leniency in exchange for the information).

With regard to questions about whether a statement was voluntarily given, the Indiana

7

Supreme Court has held:

> In determining whether a statement was voluntarily given we consider the surrounding circumstances. A statement must not be induced by any violence, threats, promises or any other improper influences. In viewing the voluntariness of a confession we do not weigh the evidence. If there is sufficient evidence to support the trial court, we will not disturb the ruling of admissibility.

*Turner v. State*, 273 Ind. 627, 629, 407 N.E.2d 235, 237 (1980) (internal citations omitted).

Again, here, the record reveals that, at Spengler's co-defendant's request, jail officials allowed Spengler and her co-defendant to engage in a monitored conversation in the jailhouse visitation booths via the jailhouse recorded phone lines. Nothing in the record indicates that Spengler's co-defendant attempted to elicit any incriminating statements from Spengler or was promised or received any leniency or benefit for attempting to elicit incriminating statements from Spengler. To the contrary, the record indicates that Spengler's co-defendant was acting on his own initiative and that the conversation took place at Spengler's co-defendant's request, apparently so that he could try to convince Spengler to deny any involvement in the killings and allow him to take sole responsibility for their crimes.[7]

Upon review, we conclude that the record supports an inference that Spengler's co-defendant was acting on his own behalf, not on behalf of the State when he spoke to Spengler. As such, he did not qualify as a governmental agent when he spoke to Spengler.

---

[7] Review of the conversation indicates that Spengler repeatedly rejected her co-defendant's request that she deny involvement in or knowledge of the killings and subsequent placement of the bodies in the shed. Spengler repeatedly indicated that she was involved in the killings and indicated that she had already admitted as much to the police.

8

*See generally Hobbs*, 548 N.E.2d at 167 (holding that the trial court acted within its discretion in admitting testimony of co-inmate of defendant who testified about statements made by defendant regarding the crime because the co-inmate acted on his own initiative and was not instructed by police to initiate any conversation with or collect information from defendant or promised any benefit in exchange for doing so); *Dodson*, 502 N.E.2d at 1336 (holding that the trial court acted within its discretion in admitting the evidence because the inmate at issue acted on his own initiative and not at the request of police). Accordingly, Spengler's comments made during her conversation with her co-defendant did not qualify as involuntary statements made during a custodial interrogation. The trial court, therefore, did not abuse its discretion in admitting a recording of this conversation at trial.

## B. Spengler's Phone Conversations with Her Mother

Spengler also claims that the trial court abused its discretion in admitting a recording of conversations Spengler engaged in with her mother over the jailhouse recorded phone lines. Again, in challenging the admissibility of the recording of these conversations, Spengler does not claim that she had any expectation of privacy or that any such right was violated when jail officials recorded the conversation between her and her mother. Instead, Spengler argues that the trial court abused its discretion in admitting the recording of these conversations because the content of the conversations was unfairly prejudicial. Specifically, Spengler argues that the content of the calls, which included repeated use of curse words and occasional references to potential criminal penalties, activities offered in prison, and possible homosexual conduct, "likely had a significant unfair prejudicial impact on the jury in

9

Spengler's case." Appellant's Br. p. 16.

"'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ind. Evidence Rule 401. "'In order to be admissible, the evidence need only have some tendency, however slight, to make the existence of a material fact more or less probable, or tend to shed any light upon the guilt or innocence of the accused.'" *Steinberg v. State*, 941 N.E.2d 515, 524 (Ind. Ct. App. 2011) (quoting *Simmons v. State*, 717 N.E.2d 635, 638 (Ind. Ct. App. 1999)), *trans. denied*. However, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Evid. R. 403. The Indiana Supreme Court has noted that because all relevant evidence in a criminal prosecution is "inherently prejudicial," "the inquiry boils down to a balance of probative value against the likely unfair prejudicial impact the evidence may have on the jury." *Richmond v. State*, 685 N.E.2d 54, 55-56 (Ind. 1997).

During the conversations at issue in the instant appeal, Spengler made numerous references to the killings which indicated that she was knowledgeable about, was present for, and participated in the killings. These statements are relevant as they have a tendency to shed light on Spengler's guilt. *See Steinberg*, 941 N.E.2d at 524. Despite the unquestionable relevance of Spengler's comments about the killings, Spengler claims that the conversations are unfairly prejudicial because during these conversations, both Spengler and her mother repeatedly used curse words and Spengler made sporadic references to the potential penalties

10

that she could face if convicted. Spengler also made sporadic references to activities provided in prison and to her "wife," which could allude to a potential homosexual relationship. Spengler, however, does not explain how she was prejudiced by these sporadic references or her and her mother's use of curse words. We find it extremely unlikely that the jury decided to convict Spengler merely because of a few sporadic references to a "wife," potential penalties, or services offered in prison when the recording of the conversations contained multiple statements acknowledging Spengler's guilt. The probative value of Spengler's statements, which, again, indicated that she was knowledgeable about, was present for, and participated in the killings, far outweighs the potential harm of the repeated use of curse words by both Spengler and her mother and periodic references to potential homosexual behavior, activities offered in prison, and the potential range of penalties that Spengler might face, if convicted. As such, we conclude that the trial court did not abuse its discretion in admitting the recording of the conversations between Spengler and her mother.

## II. Sufficiency of the Evidence

Spengler next contends that the evidence is insufficient to sustain her convictions for murder and aiding murder.[8]

> When reviewing the sufficiency of the evidence to support a conviction, appellate courts must consider only the probative evidence and reasonable inferences supporting the verdict. It is the fact-finder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. To preserve this

---

[8] Spengler does not present any argument relating to the sufficiency of the evidence relating to her conviction for Class A misdemeanor invasion of privacy.

11

structure, when appellate courts are confronted with conflicting evidence, they must consider it most favorably to the trial court's ruling. Appellate courts affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. It is therefore not necessary that the evidence overcome every reasonable hypothesis of innocence. The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict.

*Drane v. State*, 867 N.E.2d 144, 146-47 (Ind. 2007) (citations, emphasis, and quotations omitted). "In essence, we assess only whether the verdict *could* be reached based on reasonable inferences that may be drawn from the evidence presented." *Baker v. State*, 968 N.E.2d 227, 229 (Ind. 2012) (emphasis in original). Upon review, appellate courts do not reweigh the evidence or assess the credibility of the witnesses. *Stewart v. State*, 768 N.E.2d 433, 435 (Ind. 2002). Inconsistencies in witness testimony go to the weight and credibility of the testimony, "the resolution of which is within the province of the trier of fact." *Jordan v. State*, 656 N.E.2d 816, 818 (Ind. 1995).

Indiana Code section 35-42-1-1(1) provides that "[a] person who: (1) knowingly or intentionally kills another human being … commits murder, a felony." "A person engages in conduct 'knowingly' if, when [s]he engages in the conduct, [s]he is aware of a high probability that [s]he is doing so." Ind. Code § 35-41-2-2(b) (2010). "A person engages in conduct 'intentionally' if, when [s]he engages in the conduct, it is [her] conscious objective to do so." Ind. Code § 35-41-2-2(a).

Indiana Code section 35-41-2-4 (2010) allows a defendant to be convicted of a crime based on accomplice liability. Indiana Code section 35-41-2-4 provides that one "who knowingly or intentionally aids, induces, or causes another person to commit an offense

12

commits that offense." Under the statute, the individual who aids another person in committing a crime is as guilty as the actual perpetrator. *Sanquenetti v. State*, 727 N.E.2d 437, 441 (Ind. 2000); *see also Hauk v. State*, 729 N.E.2d 994, 998 (Ind. 2000). A jury may infer complicity and participation in a crime from defendant's (1) presence at the scene of the crime; (2) failure to oppose the crime; (3) companionship with the one engaged therein; and (4) course of conduct before, during, and after the offense which tends to show complicity. *Hauk*, 729 N.E.2d at 998; *Boyd v. State*, 766 N.E.2d 396, 399 (Ind. Ct. App. 2002). While the defendant's presence during the commission of the crime and her failure to oppose the crime are, by themselves, insufficient to establish accomplice liability, the jury may consider them along with other facts and circumstances tending to show participation. *Boyd*, 766 N.E.2d at 399 (Ind. Ct. App. 2002) (citing *Garland v. State*, 719 N.E.2d 1236, 1237 (Ind. 1999)). "In order to sustain a conviction as an accomplice, there must be evidence of the defendant's affirmative conduct, either in the form of acts or words, from which an inference of common design or purpose to effect the commission of a crime may be reasonably drawn." *Id*. (citing *Peterson v. State*, 699 N.E.2d 701, 706 (Ind. Ct. App. 1998)).

Spengler's challenge to the sufficiency of the evidence appears to be predicated on her incorrect contention that the trial court abused its discretion in admitting the recordings of her conversations with her co-defendant and her mother. Spengler also appears to ignore the evidence of her numerous admissions of guilt, including statements to her mother and police prior to her arrest. Instead, Spengler claims that the evidence is insufficient to prove she committed or aided in committing the killings because at trial, her co-defendant attempted to

13

take full responsibility for the killings by testifying that he acted alone. Spengler also claims that the State presented an "undifferentiated mass" of evidence from which a reasonable juror could not find her guilty. Spengler's claims in this regard, however, merely amount to an invitation for this court to reweigh the evidence, which we will not do. *See Stewart*, 768 N.E.2d at 435.

The evidence presented at trial, which, again, included multiple admissions by Spengler that she committed or participated in the killings, was sufficient to sustain Spengler's murder and aiding in murder convictions. Spengler admitted to killing the victims and to helping to move their bodies to a shed. After admitting to the killings, Spengler told police where the bodies were located. In addition, the forensic investigator who reviewed the evidence collected from the crime scene testified that, while she could not positively identify Spengler as a source of the DNA evidence recovered at the crime scene, she could not rule Spengler out as a possible source of the DNA. In light of the evidence supporting the verdict, including Spengler's admissions to committing the crimes in question, the jury could reasonably infer that Spengler knowingly or intentionally killed Timothy M. Orman and that she aided in the knowing or intentional killing of Roy Orman. *See Baker*, 968 N.E.2d at 229; *Drane*, 867 N.E.2d at 146-47. As such, we conclude that the evidence is sufficient to sustain Spengler's convictions.

### III. Appropriateness of Sentence

Spengler also contends that her 121-year sentence is inappropriate in light of the nature of her offenses and her character. Indiana Appellate Rule 7(B) provides that "The

14

Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." In analyzing such claims, we "'concentrate less on comparing the facts of [the case at issue] to others, whether real or hypothetical, and more on focusing on the nature, extent, and depravity of the offense for which the defendant is being sentenced, and what it reveals about the defendant's character.'" *Paul v. State*, 888 N.E.2d 818, 825 (Ind. Ct. App. 2008) (quoting *Brown v. State*, 760 N.E.2d 243, 247 (Ind. Ct. App. 2002), *trans. denied*). The defendant bears the burden of persuading us that her sentence is inappropriate. *Sanchez v. State*, 891 N.E.2d 174, 176 (Ind. Ct. App. 2008).

With respect to the nature of her offenses, Spengler concedes that the crimes of which she was convicted and her treatment of the victims' remains can accurately be described as "heinous," Appellant's Br. p. 23, but argues that her aggregate 121-year sentence is nonetheless inappropriate. Spengler argues that her sentences should be run concurrently rather than consecutively because her criminal acts constituted a single episode of criminal conduct rather than a larger pattern of criminal behavior. However, we note that the statutory authority limiting consecutive sentences for criminal acts committed during a single episode of criminal conduct explicitly excludes crimes of violence, including murder. *See* Ind. Code § 35-50-1-2 (2010) (providing that murder is a crime of violence and exempting crimes of violence from the stated limitation for consecutive sentences for crimes committed during a single episode of criminal conduct).

The record demonstrates that Spengler and her co-defendant shot and killed two

15

persons and placed their bodies in a shed. The bodies remained in the shed for approximately one-and-a-half to two weeks before Spengler informed police of the killings and the location of the bodies. By the time police found the bodies, the bodies had begun to decompose and the shed where the bodies were placed had been overrun by flies and other insects. Spengler is correct to describe her actions as "heinous."

With respect to her character, Spengler claims that her 121-year sentence is inappropriate because she has a documented history of mental health issues, she was relatively young at the time she committed the crimes, and she has a minor criminal history. A person's mental health history should be considered at sentencing if there is a nexus between the defendant's mental health and the crime in question. *See Corralez v. State*, 815 N.E.2d 1023, 1026 (Ind. Ct. App. 2004). In the instant matter, nothing in the record establishes a nexus between these claimed mental health issues and the commission of the instant criminal acts. Moreover, upon evaluation of Spengler's competency to stand trial, Dr. Asad Ismail found that Spengler exhibited an "average" intelligence and did not display any evidence of psychosis, delusions or hallucinations, mania, or hypomania. Appellant's App. Vol. 2, p. 81.

Further, in Indiana, a trial court is only required to consider a criminal defendant's age at sentencing if the defendant is younger than sixteen years old. *See generally Monegan v. State*, 756 N.E.2d 499, 504-05 (Ind. 2001) (providing that relevant statutory authority evinces strong legislative sentiment that a child younger than sixteen should be treated differently in our judicial and correctional systems that one who is sixteen or older). Spengler, who, again,

was twenty-three when she committed the instant criminal acts, is not entitled to receive special consideration because of her age.

We acknowledge that Spengler's criminal history is relatively minor and lacks gradual escalation. Spengler's criminal history consists of a juvenile adjudication for what would be Class D felony escape if committed by an adult. Spengler claims her minor criminal history prior to the commission of the instant offenses does not "show a pattern of escalation." Appellant's Br. p. 26. We cannot agree. Spengler went from committing the relatively minor criminal act of what would be Class D felony escape if committed by an adult to committing murder and aiding in the murder of a second person. This exhibits a rapid escalation of the seriousness of Spengler's criminal acts. In addition, the pre-sentence investigation report that was completed prior to sentencing indicates that Spengler has a pending Class D felony battery resulting in bodily injury charge, and that her victim in that case is a law enforcement officer. Spengler's criminal history, her commission of the instant criminal acts, and her pending criminal charge indicate an ongoing disregard for the lives and safety of others as well as a disregard for the law.

In summary, Spengler, together with her co-defendant, shot and killed her co-defendant's father and uncle, dragged their bodies to a shed, and left the bodies to rot. We cannot say that her 121-year sentence is inappropriate.

The judgment of the trial court is affirmed.

BROWN, J., concurs.

RILEY, J., concurs in part and dissents in part with opinion.

17

# IN THE
# COURT OF APPEALS OF INDIANA

TAMMY SPENGLER,                             )
                                           )
    Appellant-Defendant,                 )
                                           )
         vs.                          )          No. 88A01-1207-CR-318
                                           )
STATE OF INDIANA,                          )
                                           )
    Appellee-Plaintiff.                  )

**RILEY, Judge, concurring in part and dissenting in part**

While I agree with the majority's analysis and result reached in the admission of evidence issues and the sufficiency of the evidence argument, I respectfully dissent from the majority's decision to affirm the trial court's imposition of Spengler's 121-year sentence.

As noted, pursuant to Indiana Appellate Rule 7(B), we may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender. Based on Spengler's relative minor criminal history which consists of a single juvenile adjudication, I would sentence her to two concurrent terms of sixty years each for Counts I and IV and a consecutive term of one year for Count V, invasion of privacy, for an aggregate term of sixty-one years.

18