# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 29 2017, 7:23 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kirk S. Freeman
Law Office of Kirk S. Freeman
Lafayette, IN

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Caryn N. Szyper
Deputy Attorney General
Indianapolis, IN

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Jerome L. Williams, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff* | September 29, 2017 <br><br> Court of Appeals Case No. 79A02-1701-CR-40 <br><br> Appeal from the Tippecanoe Superior Court <br><br> The Honorable Randy Williams, Judge <br><br> Trial Court Cause No. 79D01-1605-F3-13 |

**Vaidik, Chief Judge.**

# Case Summary

[1] Jerome Williams was convicted of robbery while armed with a deadly weapon, robbery resulting in bodily injury, and conspiracy to commit robbery. He appeals, arguing that the evidence is insufficient to support the convictions. While we find sufficient evidence to convict, we also conclude, sua sponte, that the two convictions for robbery violate double jeopardy because there was only one robbery. We remand this matter to the trial court with instructions to vacate one of the robbery convictions.

# Facts and Procedural History

[2] In early April 2016, Aiden McNeill posted online ads to sell his AR-15 rifle. After posting the ads, a man identified later only as "Middleman" approached McNeill outside of his home and asked if McNeill had anything for sale or knew where he could purchase a gun. Because of the neighborhood, McNeill did not find this conversation unusual. McNeill informed "Middleman" that he had an AR-15 rifle for sale and gave him his cell-phone number.

[3] On April 12, "Middleman" called McNeill and inquired further about the rifle. "Middleman" made multiple phone calls to McNeill to try to set up a buy for later that day. McNeill eventually agreed to meet with "Middleman" and sell the gun that day. McNeill created a bill of sale, and a man other than "Middleman" went to McNeill's home and signed the bill of sale as "Cashmere Jordan." Despite the details of the sale being prearranged, Cashmere did not

purchase the gun from McNeill but rather directed McNeill to go to the Spring Gardens apartment complex down the road.

[4] McNeill had an uneasy feeling about going to Spring Gardens alone, so, incredibly, he decided that his girlfriend and four-year-old son should accompany him to the buy as his "backup." "Middleman" directed McNeill to the back of the apartment complex and told McNeill to park next to a white SUV, which had been backed into its parking spot. McNeill parked and got out of his car; three men exited the SUV, including Aaron Scott. Williams, the driver of the SUV, remained inside.

[5] McNeill and the passengers walked to the trunk of his car to inspect the rifle. Scott took the rifle and told McNeill to get into the SUV to get paid. Thinking this was an odd request, McNeill grabbed an unloaded handgun out of his trunk and shoved it into his waistband. He then got into the SUV, sitting behind Williams, and Scott sat in the front passenger seat. Scott then immediately drew his handgun and pointed it at McNeill. Scott told the back-seat passengers to "get that gun off" of McNeill, referring to McNeill's handgun. Tr. Vol. II p. 65. A fight ensued between McNeill and the two unidentified passengers sitting next to him. McNeill was shoved up against the car window, with both passengers holding him against the window by his neck.

[6] While the rear passengers were trying to get McNeill's handgun from him, Scott alternated between pointing the gun at McNeill and at his girlfriend, who was still sitting inside the other car. When pointing the gun at the girlfriend, Scott

leaned over Williams, placing the gun directly in front of Williams's face. Throughout the entire ordeal, Williams stared out the driver-side window at McNeill's girlfriend with a look that said, "hey don't do anything" like call 911 or try to help McNeill. *Id.* at 122. Williams did not appear surprised by the fight or the fact that Scott had pulled out a handgun.

[7] The fight lasted approximately one minute. McNeill was pulled through the SUV and thrown to the ground. The two back-seat passengers and Scott hit and kicked McNeill. Scott then struck McNeill on the back of the head three times with the rifle. The three men got back into the SUV, and Williams pulled out of the parking lot at a speed that caused the tires to squeal. As Williams drove away, McNeill pulled out his cell phone and took a picture of the SUV.

[8] McNeill called 911, and officers from the Lafayette Police Department responded to the scene. Officers found a cell phone in the parking spot where the SUV had been parked and later determined that it belonged to Williams. Officers were able to access the call log on the cell phone and discovered that "Middleman's" phone number was on Williams's phone as well as McNeill's. Many of the calls "Middleman" placed on April 12 to Williams were made within minutes of calls he had with McNeill, revealing a "triangle" of communication between the three men. *See* Tr. Vol. III pp. 8-51; Exs. 44, 53. Officers also obtained a copy of the photo McNeill took of the SUV. They located the SUV in the parking lot of McNeill's apartment complex. The SUV was a rental and had been rented to Lolita Logan, Williams's girlfriend.

[9] McNeill was taken to the hospital for injuries he sustained during the fight, including a gash on his head that required seven staples to close. While at the hospital, officers showed McNeill a series of photo arrays, and McNeill identified Williams as the driver of the SUV and Scott as the front-seat passenger. He was not able to identify either of the back-seat passengers.

[10] Based on the robbery of McNeill, the State charged Williams with three Level 3 felonies: robbery while armed with a deadly weapon, robbery resulting in bodily injury, and conspiracy to commit robbery. A jury trial was held in November 2016. During the trial, the State argued that Williams was guilty as an accomplice. The State also presented phone records between "Middleman," Williams, and Scott. The records indicate that "Middleman" called Williams over 100 times between April 1 and April 12, with twenty to thirty calls placed on the day of the robbery. Williams and Scott also talked on the phone approximately five times before the robbery. The jury found Williams guilty on all counts. On each count, Williams was sentenced to a term of ten years in the Department of Correction, with one year suspended to probation. The court ordered the sentences to run concurrently.

[11] Williams now appeals.

# Discussion and Decision

[12] Williams contends that the evidence is insufficient to support his convictions. When reviewing the sufficiency of the evidence, we neither reweigh the

evidence nor determine the credibility of witnesses; that role is reserved for the factfinder. *Bailey v. State*, 979 N.E.2d 133, 135 (Ind. 2012). "The evidence— even if conflicting—and all reasonable inferences drawn from it are viewed in a light most favorable to the conviction." *Id.* A conviction will be affirmed "if there is substantial evidence of probative value supporting each element of the crime from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." *Id.*

# I. Robbery

[13] Williams argues that the evidence is insufficient to convict him as an accomplice for robbery while armed with a deadly weapon and robbery resulting in bodily injury. Robbery occurs when a person "knowingly or intentionally takes property from another person or from the presence of another person: (1) by using or threatening the use of force on any person; or (2) by putting any person in fear . . . ." Ind. Code § 35-42-5-1. Robbery, as defined, is a Level 5 felony, but the crime is elevated to a Level 3 felony if it is committed while armed with a deadly weapon or results in bodily injury to any person other than the defendant. *Id.*

[14] "It is well settled that there is no distinction between the responsibility of a principal and an accomplice." *Stokes v. State*, 919 N.E.2d 1240, 1245 (Ind. Ct. App. 2010), *trans. denied*. "A person who knowingly or intentionally aids, induces, or causes another person to commit an offense commits that offense . . . ." Ind. Code § 35-41-2-4. It is not necessary that the evidence show the

individual personally participated in the commission of each element of the crime because the act of one companion is imputed to all. *Griffin v. State*, 16 N.E.3d 997, 1003 (Ind. Ct. App. 2014). To determine whether an individual is an accomplice, we look at four factors: (1) presence at the scene of the crime; (2) companionship with another engaged in the crime; (3) failure to oppose the commission of the crime; and (4) the individual's conduct before, during, and after the occurrence of the crime. *Id.*

[15] Williams concedes that he was present at the scene of the robbery and did nothing to contest the commission of the robbery but notes that these facts by themselves are insufficient to establish accomplice liability. *See Turner v. State*, 755 N.E.2d 194, 198 (Ind. Ct. App. 2001), *trans. denied*. Nevertheless, the jury may consider them in conjunction with the other two factors—companionship and conduct—that tend to show that one acted as an accomplice to a crime. *Griffin*, 16 N.E.3d at 1004.

[16] "Middleman," who set up the "buy" with McNeill, spoke to Williams on the phone upwards of thirty times on the day of the robbery. Most of those phone calls were within mere minutes of "Middleman" talking to McNeill. Williams also spoke with Scott on the phone multiple times before the robbery took place. These phone records establish Williams's companionship with "Middleman" and Scott.

[17] Williams's conduct before the robbery was such that he was in constant contact with "Middleman," procured his girlfriend's rental car as the getaway car and

backed the SUV into the parking space for an easy exit. During the robbery, Williams did not appear surprised by the fight taking place in the back seat or the fact that Scott had pulled out a handgun. Rather, he stared out of the driver-side window at McNeill's girlfriend with a look that she interpreted to mean that she could not help McNeill or call 911. Moreover, while Scott and the other passengers were punching, kicking, and beating McNeill with the rifle, Williams did not drive away. He waited until all three passengers were back in the SUV before driving off at a speed that caused the tires to squeal. Williams then abandoned the SUV in a nearby parking lot.

[18] Williams claims that his case is "directly analogous" to our Supreme Court's decision in *Garland v. State,* 719 N.E.2d 1236 (Ind. 1999). Appellant's Br. p. 8. In *Garland*, the Court found insufficient evidence was presented to convict the defendant of murder as an accomplice for killing his father. 719 N.E.2d at 1242. The Court reached this conclusion largely because of the "absence of evidence demonstrating that the defendant took any step to aid, induce, or cause the crime, even though the defendant may have known that [the killer] intended to commit murder, and took no action to prevent it." *Id.* We distinguish the case before us from the holding in *Garland* because Williams did take steps to aid, induce, or cause the robbery: he obtained the SUV, backed into the parking space to facilitate a quicker getaway, and communicated multiple times with "Middleman" and Scott before the robbery. Having examined the four factors for accomplice liability, we conclude that the

evidence is sufficient to support Williams's convictions for robbery with a deadly weapon and robbery resulting in bodily injury.

[19] Despite finding sufficient evidence, we conclude that the trial court erred when it entered judgment of convictions for both robbery convictions. Williams does not raise the issue of double jeopardy for our review, and we reach this conclusion sua sponte. The State brought two separate charges of robbery based on two separate theories of the same robbery. Williams was found guilty under both theories, but because only one robbery occurred, the entry of judgment on both charges violates double jeopardy. *See Lane v. State*, 428 N.E.2d 28, 31 (Ind. 1981) (holding that a defendant who robs one victim one time can be convicted of only one count of robbery). We remand to the trial court with instructions to vacate one of the robbery convictions.

## II. Conspiracy

[20] Williams also contends that the State presented insufficient evidence to support his conviction for conspiracy to commit robbery. An individual conspires to commit a felony when, with the intent to commit the felony, the individual agrees with another person to commit the felony, and one of the parties performs an overt act in furtherance of the agreement. Ind. Code § 35-41-5-2.

[21] Williams only argues that the State failed to prove that an agreement existed between Williams and another individual to rob McNeill. The State is not required to prove that an express, formal agreement existed. *Guffey v. State*, 42 N.E.3d 152, 164 (Ind. Ct. App. 2015), *trans. denied*. Proof of the conspiracy

may rest entirely on circumstantial evidence. *Id.* The State introduced multiple pages of phone records showing a "triangle" of calls between Williams, "Middleman," and McNeill. *See* Ex. 53. "Middleman" called Williams between twenty and thirty times on the day of the robbery, the majority of which were made within minutes of "Middleman" speaking to McNeill. Williams also spoke with Scott on at least five different occasions leading up to the robbery and was not surprised when Scott brandished a handgun.

[22] Williams is correct that the State did not introduce any evidence of the content of the phone conversation. But the State was not required to do so. Based on the evidence presented, the jury could reasonably infer that Williams and "Middleman," or Williams and Scott, or all three men had an agreement to rob McNeill due to the multitude of calls placed, the timing of the calls, and Williams's lack of reaction to the robbery itself.

[23] Affirmed in part and remanded in part with instructions.

Mathias, J., and Crone, J., concur.