# FOR PUBLICATION



ATTORNEY FOR APPELLANT:

**STANLEY F. WRUBLE III**
South Bend, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**MICHAEL GENE WORDEN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| LEE TRAVIS GRIFFIN, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 71A03-1311-CR-458 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

### APPEAL FROM THE ST. JOSEPH SUPERIOR COURT
The Honorable Elizabeth C. Hurley, Judge
Cause No. 71D08-1301-MR-1

**September 11, 2014**

**OPINION - FOR PUBLICATION**

**NAJAM, Judge**

## STATEMENT OF THE CASE

Lee Travis Griffin appeals his convictions for robbery, as a Class A felony; burglary, as a Class A felony; and felony murder, following a jury trial. Griffin presents three issues for review:

1. Whether the State presented sufficient evidence to support his conviction for robbery.

2. Whether the trial court abused its discretion in allowing the State to present autopsy photographs.

3. Whether the trial court abused its discretion in refusing to give a proffered jury instruction.

We affirm.

## FACTS AND PROCEDURAL HISTORY

On the night of December 27, 2012, Tyler Jordan, Autumn Jordan, and Christine Jordan gathered at the home of Kent and Sandra Price ("the home"), who are relatives of the Jordans. Also present at the home was Kent's daughter, Klarisa, and a few of her friends.

At approximately 9:30 p.m., Tyler made his way from the home's second-floor bedroom to the home's first floor kitchen, located at the rear of the home. While there, Tyler heard a knock on the back door, which entered into the kitchen. When Tyler pulled back the door's curtains to see outside, Walter Neely forced open the door and entered the home. Neely grabbed a knife from the kitchen butcher block and cut Tyler's hands

2

before pushing him to the floor. Four other men, including Griffin, then entered the home wearing ski or surgical masks.[1]

After the men entered, one of the men climbed on top of Tyler, placed his hand over Tyler's mouth, and instructed him "to shut up, to be quiet." Tr. at 126 (Sept. 10-11, 2013) (hereinafter "Sept. 10 Tr.").[2] While some of the other men went upstairs, this man, armed with a revolver, took Tyler to the basement. Tyler blacked out for a time soon thereafter and, while he could not specifically recall, he subsequently reported that he believed his attacker had knocked him unconscious.

When Tyler regained consciousness, he "didn't look up" but heard the man searching the basement. Id. at 128. The man noticed that Tyler was awake and asked Tyler whether he or his uncle knew the codes to the Prices' safes. The man then went upstairs, but, before doing so, he pointed his gun at Tyler, cocked it, and commanded him, "[D]on't move or I'll kill you." Id. Tyler could hear screaming and stomping emanating from the home's upper levels.

Thereafter, at least two men—Neely and the man with the gun—"busted through the door" to a second-floor bedroom where everyone but Klarisa and her friends had gathered. Id. at 167. The two men stormed into the room. Kent was knocked down, and Christine, who jumped onto Neely, was "slung" to the ground. Id. Neely swung at both Kent and Christine with the knife. The second man pointed the gun at Christine, threatened her life, and ordered her to the bathroom. He also threatened to kill Sandra.

---

[1] Neely wore a tan, brown, or beige coat and did not wear a mask.

[2] For reasons unknown, the consecutively transcribed pages are not consecutively paginated. The first two days of trial span two, consecutively-paginated pages. The third day of trial, however, holds its own, independently-paginated volume.

The men demanded money, jewelry, guns, and the home's safes, and they ransacked the bedroom. Meanwhile, a third intruder, also armed with a knife, made his way to the third-floor bedroom where Klarisa and her friends were located. The man searched the room for valuables, taking several items, but did not locate Klarisa or her friends, who hid when they heard the commotion below.

At some point, Klarisa and her friends were able to call 9-1-1. Christine had also managed to call 9-1-1. Officers with the South Bend Police Department responded to the calls and surrounded the home. As the intruders attempted to flee the home, the police apprehended them. Griffin was among those apprehended, and he was still inside the house when the police ordered him out. Griffin, accompanied by another intruder, exited through the home's rear entrance. When officers arrested him, Griffin wore black clothes and a surgical mask but was unarmed.

When the officers entered the home, they discovered Kent and Sandra had sustained serious injuries from knife wounds from Neely's attack. Sandra subsequently died from her injuries, which included a wound to her neck. The officers also found several items of property collected at the rear door of the home and a black duffel bag full of the Prices' property in the dining room.

Officers transported Griffin to the South Bend Police Department. En route, without being prompted or questioned, Griffin repeatedly expressed that he knew he had acted wrongfully and stated that "he messed up, he messed up, he even drug his brothers into this." Id. at 55. While awaiting formal questioning at the station, Griffin talked to

4

himself, and he expressed his belief that no confession would be needed because he and his confederates had been caught, would tell the same story, and he would go to prison.

The following day, the State charged Griffin with two counts of robbery and two counts of burglary, all as Class A felonies. After Sandra died, the State amended its information and charged Griffin with two counts of felony murder, which corresponded to the State's allegations that Griffin had committed robbery and burglary against Sandra. The State's allegations of robbery were based on a theory of accomplice liability.

The court held Griffin's jury trial on September 10 through September 12, 2013. At trial, the State called Dr. Joseph Prahlow, a forensic pathologist, to testify regarding Sandra's cause of death. During the examination, the State offered Exhibits 42, 43, and 44, which were autopsy photographs that depicted the knife wounds to Sandra's face and neck. Griffin objected to the admission of these photographs on the basis that they were gruesome and showed medically-altered wounds. The trial court admitted the photographs over Griffin's objection.

At the close of trial, Griffin proffered to the trial court his Jury Instruction No. 1, which read:

> In determining whether the guilt of the accused is proven beyond a reasonable doubt, you should require that the proof be so conclusive as to exclude every reasonable theory of innocence.

Appellant's App. at 117. The trial court concluded that Griffin's proposed Jury Instruction No. 1 required a prior finding "that the only evidence on the actus reus of the offense was circumstantial," which the court did not consider appropriate. Tr. at 4-5

5

(Sept. 12, 2013) (hereinafter "Sept. 12 Tr."). Thus, the court refused to give Griffin's proposed instruction.

The jury convicted Griffin on all counts. The trial court entered its judgment of conviction on Count II (robbery of Kent), Count IV (burglary with injury to Tyler), and Count V (felony murder, with the underlying felony being the robbery of Sandra). On October 11, 2013, the court ordered Griffin to serve thirty years on Count II, thirty years on Count IV, and fifty-five years on Count V, which were to be served consecutively for a total aggregate term of 115 years. This appeal ensued.

## DISCUSSION AND DECISION

### Issue One:  Sufficiency of the Evidence

Griffin first contends that the State presented insufficient evidence to support his robbery conviction. In essence, Griffin maintains that the evidence shows only that:  (1) at best, he was merely present at entry and on the first floor of the home and was not a direct participant in the robberies, which occurred on other floors of the home; and (2) for the same reason, he had no knowledge that the robberies were being perpetrated. Our standard of review for sufficiency of the evidence claims is well-settled. Tobar v. State, 740 N.E.2d 109, 111 (Ind. 2000).

> In reviewing the sufficiency of the evidence, we examine only the probative evidence and reasonable inferences that support the verdict. We do not assess witness credibility, nor do we reweigh the evidence to determine if it was sufficient to support a conviction. Under our appellate system, those roles are reserved for the finder of fact. Instead, we consider only the evidence most favorable to the trial court ruling and affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt.

6

Pillow v. State, 986 N.E.2d 343, 344 (Ind. Ct. App. 2013) (citations omitted) (internal quotation marks omitted).

In order to prove robbery, as a Class A felony, the State was required to show that Griffin knowingly or intentionally took property from another person, or from the presence of another person, by force or threat of force on any person or by putting any person in fear, which resulted in serious bodily injury to someone other than Griffin. Ind. Code § 35-42-5-1. The State charged Griffin as an accomplice, and "[a] person who knowingly or intentionally aids, induces, or causes another person to commit an offense commits that offense . . . ." Ind. Code § 35-41-2-4. Therefore, "[i]t is not necessary that the evidence show the accomplice personally participated in the commission of each element of the offense." Wilson v. State, 455 N.E.2d 1120, 1123 (Ind. 1983). "[T]he acts of one accomplice are imputed to all." Collier v. State, 470 N.E.2d 1340, 1342 (Ind. 1984). So long as the State shows that one participated in the commission of an offense as an accomplice, the accomplice "is criminally responsible for everything which follows incidentally in the execution of the common design, as one of its natural and probable consequences, even though it was not intended as part of the original design or common plan . . . ." Johnson v. State, 605 N.E.2d 762, 765 (Ind. Ct. App. 1992) (citations and quotations omitted), trans. denied.

"The particular facts and circumstances of each case must be considered in determining whether a person participated in the commission of an offense as an accomplice." Peterson v. State, 699 N.E.2d 701, 706 (Ind. Ct. App. 1998). For Griffin's conviction to stand, "there must be evidence of [his] affirmative conduct, either in the

7

form of acts or words, from which an inference of a common design or purpose to effect the commission of a crime may be reasonably drawn." Id. "Each participant must knowingly or intentionally associate himself with the criminal venture, participate in it, and try to make it succeed." Cohen v. State, 714 N.E.2d 1168, 1177 (Ind. Ct. App. 1999), trans. denied. That said, the State need not show that Griffin "was a party to a preconceived scheme; it must merely demonstrate concerted action or participation in an illegal act." Rainey v. State, 572 N.E.2d 517, 518 (Ind. Ct. App. 1991).

While it is true that mere presence at the scene of a crime is insufficient to make one an accomplice, the Court may consider presence in conjunction with other factors that tend to show that one acted as an accomplice to a crime. See Peterson, 699 N.E.2d at 706. There are four factors relevant to this inquiry, each of which Griffin asserts the State failed to show: "(1) presence at the scene of the crime; (2) companionship with another at the scene of the crime; (3) failure to oppose commission of crime; and (4) course of conduct before, during, and after occurrence of crime." Bruno v. State, 774 N.E.2d 880, 882 (Ind. 2002).

### Presence at the Scene

The evidence shows that Griffin, dressed in black and wearing a mask, broke and entered the home with four other men. He entered only after Neely cut Tyler's hands with a knife and pushed him to the floor. Griffin did not stop this assault or protest Neely's actions. Police apprehended Griffin at the scene, and Griffin was still in the home when the officers arrived. Therefore, it was reasonable for the jury to draw the inference that Griffin was in the home for the entire duration of the invasion.

8

Still, Griffin contends that "no testimony or evidence plac[ed] [him] on the second or third floor of the home" or connected him to any of the weapons used. Appellant's Br. at 11. This, he concludes, proves that he was not present for the purposes of accomplice liability. But we reject Griffin's request to so limit the meaning of "presence" where distinctions are drawn between the floors of a single-family home. Further, Griffin need not have had direct ties to his confederates' weapons for accomplice liability to attach; through the acts of his confederates, the law imputes that connection to him. See Collier, 470 N.E.2d at 1342.

## Companionship at the Scene

The State also presented evidence that Griffin entered the home with four other men, who were similarly dressed and concealed, after one of those men attacked Tyler. He was present in the home as one man forced Tyler into the basement, threatened Tyler's life, and searched for safes and when the others went to the second and third floors, where they attacked Kent, Sandra, and Christine with a knife, seriously wounding Kent and murdering Sandra. Tyler could hear the screaming and commotion from the basement, as could Klarisa on the third floor. Griffin was in the home when his confederates ransacked the upper floors looking for valuable property and when they collected that property by the home's rear entrance. Griffin exited the rear of the home accompanied by a confederate, and later volunteered that he "got his brothers into this." Sept. 10 Tr. at 55. Griffin's suggestion that "there is nothing placing [him] at the scene or connecting him as a companion to any of the perpetrators" simply has no merit.

9

Appellant Br. at 12. The State's evidence plainly demonstrates Griffin's companionship with his confederates.

## Failure to Oppose Commission of the Crime

Griffin contends that the evidence does not support his conviction as an accomplice because he was not aware that his confederates were committing a robbery in the home. Thus, he maintains that he cannot be said to have failed to oppose the commission of the robbery. But, again, the evidence shows that Griffin remained in the home for the duration of invasion, and we decline to read Griffin's narrow definition of presence into the accomplice liability statute. Beyond this, the evidence demonstrates that Griffin did not need to be physically present on the second and third floors of the home to know what occurred there. From the basement, two floors below, Tyler heard the screaming and stomping emanating from the second floor. Klarisa heard the same on the third floor. Therefore, the jury could reasonably conclude that, no matter where Griffin was in the home, he must have heard the commotion and did nothing to oppose the crimes. Indeed, the evidence shows that Griffin did not oppose the knife attack on Tyler but, instead, continued his unlawful entry into the residence. Finally, given the statements Griffin made while in custody that he "got his brothers into this," the jury could reasonably conclude that he not only failed to oppose the robberies but was, in fact, an active participant in them. Sept. 10 Tr. at 55.

## Course of Conduct

For all the reasons explained above, the State presented sufficient evidence of Griffin's conduct before, during, and after the crimes to convict him as an accomplice.

10

Summary

We hold that the State presented sufficient evidence to demonstrate that Griffin knowingly or intentionally associated himself with a criminal venture, participated in it, and tried to make it succeed. See Cohen, 714 N.E.2d 1168. Even if Griffin intended for that venture to encompass a burglary only, a robbery and felony murder followed as probable and natural consequences of the burglary. It does not matter whether Griffin personally participated in each element of these offenses; the acts of his confederates are imputed to him. See Collier, 470 N.E.2d at 1342; See Wilson, 455 N.E.2d at 1123. Thus, we affirm on this issue.

**Issue Two: Admissibility of the Autopsy Photographs**

Griffin next challenges the admission, over his objection, of State's Exhibits 42, 43, and 44. At trial, Griffin argued that these autopsy photographs were prejudicial because of their gruesome nature and because the wounds depicted had been altered by the pathologist. Sept. 10 Tr. at 205-06. On appeal, Griffin renews his prejudice objection but does so on different grounds. In particular, Griffin contends the photographs have low probative value because the "most probative evidence to be offered against him would be that which would satisfy the [four] requirements [for finding an accomplice relationship] [under] Bruno . . . , and [t]hese photographs offer no probative value to those claims." Appellant's Br. at 15. He further asserts that they are prejudicial because Neely, not Griffin, inflicted the wounds to Sandra. Id. He continues, "[T]hey remove the Jury's focus from the apparent lack of evidence connecting Griffin to the murder and focus the jury's attention on the heinous nature of Neely's actions." Id.

11

Because the grounds raised in support of his objection at trial are substantially different than those he raises on appeal, we agree with the State that Griffin has waived this issue for appeal. However, our decision is grounded in different authority than that cited by the State.[3]

As we explained in Showalter v. Town of Thorntown, 902 N.E.2d 338, 342 (Ind. Ct. App. 2009), trans. denied:

> A party generally waives appellate review of an issue or argument unless that party presented that issue or argument before the trial court. However, that principle is not without limits. . . .
>
> The rule that parties will be held to trial court theories by the appellate tribunal does not mean that no new position may be taken, or that new arguments may not be adduced; all that it means is that substantive questions independent in character and not within the issues or not presented to the trial court shall not be first made upon appeal. Questions within the issues and before the trial court are before the appellate court, and new arguments and authorities may with strict propriety be brought forward. . . .
>
> This rule exists because trial courts have the authority to hear and weigh the evidence, to judge the credibility of witnesses, to apply the law to the facts found, and to decide questions raised by the parties. Appellate courts, on the other hand, have the authority to review questions of law and to judge the sufficiency of the evidence supporting a decision. The rule of waiver in part protects the integrity of the trial court; it cannot be found to have erred as to an issue or argument that it never had an opportunity to consider. Conversely, an intermediate court of appeals, for the most part, is not the forum for the initial decisions in a case. . . .

(Emphasis in original; citations and quotations omitted).

---

[3] The authority cited by the State supports an analogous, but nonetheless different, position than the State explores. This authority addresses the situation where counsel raised an entirely different objection at trial than that argued on appeal. See Turner v. State, 953 N.E.2d 1039, 1058 (Ind. 2011) (noting that counsel raised a hearsay objection at trial but argued relevance on appeal.); Lyons v. State, 976 N.E.2d 137, 141 (Ind. Ct. App. 2012) (noting that counsel objected to the form of the question at trial—"speculation"—but, on appeal, contended that the opinion testimony elicited was based on an improper foundation). Here, Griffin objected at trial under the same Indiana Evidence Rule that he raises on appeal, Rule 403, but his current argument under that rule is substantially different than the one he presented to the trial court.

Here, the trial court did not have the opportunity to consider the argument that Griffin presents on appeal. At trial, Griffin argued only that the photographs were gruesome and depicted altered wounds. He made no mention of Neely's involvement or why that involvement might be prejudicial to his trial. Thus, we cannot state that the argument Griffin makes here was a question fairly within the issues before the trial court. Even though Griffin objected under the same rule of evidence both at trial and on appeal, because the trial court never had an opportunity to consider the argument Griffin now makes on appeal, the arguments raised here are independent in character and outside the issues before the trial court. Therefore, Griffin waived this issue for appeal.

Waiver notwithstanding, Griffin misstates the law. The Bruno factors provide a starting point for determining an accomplice relationship, but Bruno is not the end of the inquiry. The State still had the burden of proving every element of the offenses charged, including felony murder, beyond a reasonable doubt. Stewart v. State, 945 N.E.2d 1277, 1290 (Ind. Ct. App. 2011), trans. denied. The photographs assisted the State in meeting that burden. They assisted the testimony of the pathologist, Dr. Prahlow, in explaining Sandra's cause of death. Moreover, Dr. Prahlow explained that he and other doctors, not Griffin, were responsible for those alterations. In such instances, Indiana courts have repeatedly upheld the admission of autopsy photographs. See, e.g., Swingley v. State, 739 N.E.2d 132, 133-34 (Ind. 2000) (discussing Fentress v. State, 702 N.E.2d 721, 722 (Ind. 1998)); Jackson v. State, 973 N.E.2d 1128, 1127-28 (Ind. Ct. App. 2012), trans. denied.

**Issue Three: Griffin's Proffered Jury Instruction**

Finally, Griffin claims that the trial court abused its discretion when it failed to issue his proffered jury instruction, which he based on our supreme court's opinion in Hampton v. State, 961 N.E.2d 480 (Ind. 2012). Our standard of review regarding the issuance of jury instructions is well settled:

> The instruction of the jury lies largely within the trial court's discretion. The instruction of the jury should inform it regarding the law applicable to the facts without misleading it and to enable the jury to understand the case and arrive at a just, fair, and correct verdict. In charging the jury, the court must state to them all matters of law which are necessary for their information in giving their verdict. In considering whether error has resulted from the refusal of a tendered instruction, the court on review determines [1] whether the instruction correctly states the law, [2] whether there is evidence in the record to support the giving of the instruction, and [3] whether the substance of the instruction is covered by other instructions which are given. A defendant must demonstrate that his substantial rights have been prejudiced in order to obtain a reversal for the trial court's failure to instruct the jury.

Peterson, 699 N.E.2d at 706 (citations omitted).

The decision in Hampton turned on the difference between direct and circumstantial evidence. 961 N.E.2d at 482. Hampton distinguished the two types of evidence as follows:

> Direct evidence means evidence that directly proves a fact, without an inference, and which in itself, if true, conclusively establishes that fact. Circumstantial evidence means evidence that proves a fact from which an inference of the existence of another fact may be drawn. . . . An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts.

Id. at 489 (internal citations and quotation marks omitted).

14

Hampton found a "qualitative difference between direct and circumstantial evidence with respect to the degree of reliability and certainty they provide as proof of guilt." 961 N.E.2d at 486. Consequently, our supreme court held that

> when the trial court determines that the defendant's conduct required for the commission of a charged offense, the actus reus, is established exclusively by circumstantial evidence, the jury should be instructed as follows: In determining whether the guilt of the accused is proven beyond a reasonable doubt, you should require that the proof be so conclusive and sure as to exclude every reasonable theory of innocence.

Id. at 491 (emphasis in original). Where appropriate, this "reasonable theory of innocence instruction" provides "a safeguard urging jurors to carefully examine the inferences they draw from the evidence presented, thereby helping to assure that the jury's reasoning is sound." Id. at 486. It "informs the jury that if a reasonable theory of innocence can be made of the circumstantial evidence, then there exists a reasonable doubt, and the defendant is entitled to the benefit of that doubt." Id. (emphasis in original).

We agree with the trial court that Griffin's proposed instruction was not appropriate because the State presented direct evidence to support its allegations. Griffin concedes as much with respect to his burglary conviction. See Appellant's Br. at 17 ("It is arguable that not all of the Counts were based exclusively on circumstantial evidence . . . ."). Indeed, Tyler testified that he saw five men, some clad in black and wearing masks, force entry into the home, and officers apprehended five men that matched this description when they fled the home. This is direct evidence of a burglary.

However, Griffin contends that his robbery conviction was based exclusively on circumstantial evidence, and "Hampton does not require 'all' charged offenses to be

15

based exclusively on circumstantial evidence, merely 'a' charged offense." Id. But Griffin's argument neglects the principles of accomplice liability in his attempt to apply Hampton to his robbery conviction. Even if the evidence does not show that he participated personally in the commission of each element of the offense, Wilson, 455 N.E.2d at 1123, Griffin is guilty as if he performed the acts himself, see Collier, 470 N.E.2d at 1342. Thus, the direct evidence tending to show the commission of the offense by any accomplice applies equally to all accomplices. In other words, direct evidence against the principals is attributable to Griffin as the accomplice. In contrast, Griffin's application of Hampton would turn nearly every accomplice liability prosecution into one warranting a reasonable theory of innocence instruction, but Hampton itself implicitly rejected such a reading. See 961 N.E.2d at 487-88, 490-91 (quoting Spears v. State, 272 Ind. 634, 401 N.E.2d 331, 335 (1980)) ("To hold otherwise would require a circumstantial evidence instruction in every case involving a crime containing the element of intent. Unnecessary confusion would result from such a course.").

As discussed in depth above, the State presented eyewitness testimony, which constitutes direct evidence of a robbery committed by Griffin and his confederates. It does not matter whether Griffin participated personally in every element of the offense; the law imputes the actions of his confederates to him as if he acted out each element individually. Consequently, this evidence applies to Griffin just the same as it does to his confederates.

Because direct evidence supported all charges against him, we affirm the trial court's decision not to issue a reasonable theory of innocence instruction.  As a result, we do not reach the distinction Griffin raises regarding <u>Hampton</u>'s language.

## CONCLUSION

In sum, we conclude that the State presented sufficient evidence to support Griffin's convictions.  We also hold that Griffin waived any error related to the admission of the autopsy photographs but, his waiver notwithstanding, the trial court did not abuse its discretion when it admitted the photographs into the record.  And we hold that the trial court did not abuse its discretion when it refused to issue a reasonable theory of innocence instruction on these facts.   Thus, we affirm Griffin's convictions.

Affirmed.

BAILEY, J., and PYLE, J., concur.

17