## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Apr 28 2016, 8:37 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Michael R. Fisher
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Eric P. Babbs
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Obed Bailey,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

April 28, 2016

Court of Appeals Case No.
49A02-1509-CR-1497

Appeal from the Marion Superior Court

The Honorable Shatrese M. Flowers, Judge

The Honorable Peggy R. Hart, Commissioner

Trial Court Cause No.
49G20-1405-FB-23110

**Crone, Judge.**

# Case Summary

[1] Obed Bailey appeals his conviction and sentence for class B felony unlawful possession of a firearm by a serious violent felon ("SVF"). He contends that the handgun recovered by police was seized in violation of the federal constitutional guarantees against unreasonable search and seizure. Specifically, he asserts that even though he abandoned the handgun when he fled police, he abandoned it after he was unconstitutionally detained, and therefore the handgun is inadmissible. He also appeals his fourteen-year sentence, arguing that it is inappropriate in light of the nature of his offense and his character.

[2] We conclude that the police officers' initial approach of the vehicle in which Bailey was an occupant was a consensual encounter. By the time the police removed Bailey from the vehicle for a patdown search for weapons, the totality of the circumstances show that there existed reasonable suspicion that he had engaged in criminal activity and could be armed. Accordingly, Bailey was not unconstitutionally detained and his abandoned handgun was admissible. We also conclude that Bailey fails to carry his burden to show that his sentence is inappropriate. Therefore, we affirm.

# Facts and Procedural History

[3] The Speedway Police Department had an agreement with the management of Coppertree Apartment Complex ("Coppertree") providing that its police officers could act as agents of Coppertree and remove individuals who lacked a contractual interest in the property. Tr. at 49-50, 93. In May 2014, around 8:30

p.m., an anonymous caller advised police dispatch that three suspicious-looking black males were around one of Coppertree's laundry areas. *Id*. at 46, 93. The caller stated that two of the males may have been breaking into the laundry room coin machines and one of the males wore a knit hat with a "ball" on top and appeared to be acting as a "lookout." *Id*. at 24, 47, 93. As police were responding, the caller provided an update that the black males were sitting in a green vehicle and gave police the vehicle's license plate number.

[4] Three Speedway police officers responded to the scene, all in marked cars and in uniform. None of them activated their lights or sirens. Officer Christopher Helmer arrived first. Officer Helmer worked parttime for Coppertree as a security officer, and therefore he knew that Coppertree had previous issues with thefts from the laundry room machines. Officer Helmer saw a green vehicle with a license number matching the reported license number in the vicinity of the laundry room. He saw four black men in the vehicle, and noticed that the person in the front passenger seat, later identified as Bailey, had on a stocking cap with a ball on top. He parked his car and approached the vehicle to "[i]dentify all the subjects … [and] determine if they lived there, if they had the right to be there at all and then [deal] with the situation accordingly." *Id*. at 15. Officer Helmer went to the back of the driver's side of the vehicle and spoke with the backseat passenger. That passenger, Jeremy Armstrong, "answered [Officer Helmer's] questions but he was staring straight ahead" and "was avoiding eye contact, he was compliant but was visibly nervous." *Id*. at 15, 16.

[5]     Officer John Hammel arrived a few seconds after Officer Helmer. Officer Hammel parked his car and approached the passenger side of the vehicle, and spoke to the backseat passenger identified as Demetrius Stokes:

> [Officer Hammel] asked his name and […] was going to ask his birthdate[, but] in the course of that he appeared to be very nervous and would not make eye contact with [the officer]. He continually moved his left hand down around the seat under his body. [Officer Hammel] gave him verbal directions to keep his hands visible and in his lap. When [Stokes] disregarded [the] directions and continued to reach down and under his leg area … [Officer Hammel] thought that he [might] be trying to access a weapon or … trying to hide something so [the officer] asked him to step from the vehicle at that time.

*Id*. at 96.

[6]     Officer Nathan Shipley arrived and parked his vehicle behind the green vehicle. *Id*. at 47. Officer Shipley saw Officer Helmer near the left rear door and Officer Hammel near the rear right door. He also saw that the rear passengers had already been removed to be patted down. One of the officers informed Officer Shipley that the right rear passenger had been moving his left hand, acting nervous, and refusing to comply with orders to show his hands. Officer Shipley believed that given the nature of the call, there could be weapons involved. To "ensure the officer safety," Officer Shipley approached the front passenger side to remove Bailey from the vehicle so he could pat him down for weapons. *Id*. at 48.

Officer Shipley told Bailey that "[he] needed to pat him down," and asked him to exit the vehicle. *Id.* at 50. Bailey complied but would not make eye contact with Officer Shipley. Officer Shipley asked Bailey to put his hands on the hood of the car. Bailey refused to face the car, so Officer Shipley "grabbed his right hand … in order to escort it to the car where [he] needed it to be." *Id.* at 51. Bailey ripped his hand away and ran east. Officer Shipley pursued and yelled, "Police, stop." *Id.* at 52. Officer Shipley was about twenty feet behind Bailey when he saw Bailey pull a handgun from his waist and raise it to about shoulder level. *Id.* Officer Shipley yelled "gun" loud enough to be heard by the other officers. *Id.* at 20, 97. As Bailey turned to go around a building, Officer Shipley saw him throw the gun into a bush. Officer Helmer eventually caught up to Bailey, deployed his taser, and took Bailey into custody.[1] Officer Shipley returned to the bush and located the handgun. It had one bullet in the chamber and seven rounds in the magazine.

The State charged Bailey with class B felony unlawful possession of a firearm by a SVF, class D felony obstruction of justice, and class A misdemeanor resisting law enforcement.[2] Bailey waived his right to trial by jury. He also filed a motion to suppress the handgun, arguing that it was inadmissible because it was seized in violation of the Fourth Amendment to the United

---

[1] The other occupants of the green vehicle were given trespass warnings and asked to leave the area.

[2] The resisting law informant charge was based on Bailey knowingly fleeing Officer Shipley after Officer Shipley had identified himself by visible or audible means and ordered Bailey to stop. Appellant's App. at 23; Ind. Code § 35-44.1-3-1(a)(3).

States Constitution. The trial court conducted a combined suppression hearing and bench trial. Bailey testified and claimed that he did not throw a firearm. *Id*. at 119-20. After taking the matter under advisement, the trial court issued an order denying Bailey's motion to suppress. The trial court found Bailey guilty of unlawful possession of a firearm by a SVF and resisting law enforcement and not guilty of obstruction of justice.

At sentencing, the trial court found that Bailey's criminal history and the fact that he was on parole when he committed the current offenses were aggravating circumstances and that there were no mitigating circumstances. The trial court sentenced Bailey to an executed term of fourteen years for unlawful possession of a firearm by a SVF and a concurrent term of one year for resisting law enforcement. This appeal ensued.

## Discussion and Decision

## Section 1 – The police seizure of Bailey's handgun did not violate his Fourth Amendment rights.

Bailey argues that the police seized the handgun in violation of the protections against unreasonable search and seizure guaranteed by the Fourth Amendment to the United States Constitution, and therefore the gun was inadmissible.[3] The

---

[3] Bailey also raises a claim under Article 1, Section 11 of the Indiana Constitution, but he did not present that argument to the trial court. "A party generally waives appellate review of an issue or argument unless that party presented that issue or argument before the trial court." *Griffin v. State*, 16 N.E.3d 997, 1006 (Ind. Ct. App. 2014) (quoting *Showalter v. Town of Thorntown*, 902 N.E.2d 338, 342 (Ind. Ct. App. 2009), *trans. denied*)). Therefore, Bailey's state constitutional claim is waived.

constitutionality of a search or seizure is a question of law that we review de novo. *Lewis v. State*, 949 N.E.2d 1243, 1246 (Ind. 2011). "However, we give deference to a trial court's determination of the facts, which will not be overturned unless clearly erroneous." *Campos v. State*, 885 N.E.2d 590, 596 (Ind. 2008). Further, we do not reweigh the evidence, and we view conflicting evidence in the light most favorable to the trial court's ruling. *Id.* "As an appellate court, we may affirm a trial court's judgment on any theory supported by the evidence." *Ratliff v. State*, 770 N.E.2d 807, 809 (Ind. 2002).

[11] The Fourth Amendment states,

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

"The fundamental purpose of the Fourth Amendment 'is to protect the legitimate expectations of privacy that citizens possess in their persons, their homes, and their belongings.'" *Hines v. State*, 981 N.E.2d 150, 153 (Ind. Ct. App. 2013) (quoting *Trotter v. State*, 933 N.E.2d 572, 579 (Ind. Ct. App. 2010)). In general, the Fourth Amendment prohibits searches and seizures conducted without a warrant that is supported by probable cause. *Clark v. State*, 994 N.E.2d 252, 260 (Ind. 2013). As a deterrent mechanism, evidence obtained without a warrant is not admissible in a prosecution unless the search or seizure falls into one of the well-delineated exceptions to the warrant requirement. *Id.*

"Where a search or seizure is conducted without a warrant, the State bears the burden to prove that an exception to the warrant requirement existed at the time of the search or seizure." *Brooks v. State*, 934 N.E.2d 1234, 1240 (Ind. Ct. App. 2010), *trans. denied* (2011).

[12] One exception to the warrant requirement is abandoned property. Abandoned property is usually not subject to Fourth Amendment protection and may be seized without a warrant. *Wilson v. State*, 825 N.E.2d 49, 51 (Ind. Ct. App. 2005). Bailey concedes that he abandoned the handgun when he threw it into the bush as he was fleeing from Officer Shipley. However, he asserts that he abandoned the handgun as a result of an unconstitutional detention, and therefore it is not admissible. *See J.B. v. State*, 30 N.E.3d 51, 55 (Ind. Ct. App. 2015) ("Abandoned property is inadmissible if the abandonment occurs after the owner is improperly detained."); *Gooch v. State*, 834 N.E.2d 1052, 1054 (Ind. Ct. App. 2005) ("[I]f property is abandoned after a citizen is improperly detained, the evidence is not admissible."), *trans. denied*; *Wilson v. State*, 825 N.E.2d 49, 51 (Ind. Ct. App. 2005) (same); *State v. Pease*, 531 N.E.2d 1207, 1211-12 (Ind. Ct. App. 1988) (where officer felt a hard object in Pease's shirt during patdown search and asked him what it was and then Pease fled and threw container of amphetamines away, amphetamines were inadmissible because patdown search violated Fourth Amendment).

[13] We observe that the conditions imposed on police to satisfy the Fourth Amendment differ depending on the type of interaction occurring between a police officer and a citizen. Thus, to decide whether Bailey was detained in

violation of the Fourth Amendment, we first consider what type of interaction occurred between the police and the occupants of the green vehicle:

> There are three levels of police investigation, two of which implicate the Fourth Amendment and one of which does not. First, the Fourth Amendment requires that an arrest or detention that lasts for more than a short period of time must be justified by probable cause. Second, pursuant to Fourth Amendment jurisprudence, the police may, without a warrant or probable cause, briefly detain an individual for investigatory purposes if, based upon specific and articulable facts, the officer has a reasonable suspicion that criminal activity has [occurred] or is about to occur. The third level of investigation occurs when a police officer makes a casual and brief inquiry of a citizen, which involves neither an arrest nor a stop. This is a consensual encounter in which the Fourth Amendment is not implicated.

*Powell v. State*, 912 N.E.2d 853, 859 (Ind. Ct. App. 2009) (citations omitted).

[14] Bailey asserts that when the officers initially approached the green vehicle to speak to the occupants, they were performing an investigatory stop requiring reasonable suspicion. The State contends that the initial encounter between the police and the occupants of the green vehicle was consensual. According to the State, the encounter did not become an investigatory stop until the passengers were removed from the vehicle to be patted down for weapons, at which time the police had reasonable suspicion that the occupants could be armed. We agree with the State that the initial encounter was consensual.

[15] Determining whether an encounter is consensual or involves some level of detention

turns on an evaluation, under all the circumstances, of whether a reasonable person would feel free to disregard the police and go about his or her business. The test is objective–not whether the particular citizen actually felt free to leave, but whether the officer's words and actions would have conveyed that to a reasonable person. Examples of facts and circumstances that might lead a reasonable person to believe that he or she was no longer free to leave could include the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

*Clark*, 994 N.E.2d at 261-62 (citations and quotation marks omitted).

[16]     Officers Helmer's and Hammel's initial approaches to the green vehicle are similar to that in *Powell*, in which another panel of this Court concluded that the officer's initial approach to a parked vehicle in which Powell was an occupant was a consensual encounter. 912 N.E.2d at 862. In that case,

> the vehicle in which Powell was seated was parked on the side of a street. The vehicle was "not running." Officer Deshaies parked his squad vehicle behind the vehicle in which Powell and another individual were seated. The record reveals that Officer Deshaies was in police uniform and driving a fully marked squad vehicle, but that he did not activate the emergency lights of his squad vehicle. There is no evidence that Officer Deshaies activated his squad vehicle's siren or approached the vehicle occupied by Powell in a manner that would be considered aggressive or intimidating. Upon exiting his squad vehicle, Officer Deshaies approached the driver's side of the vehicle on foot. The record does not reflect that Officer Deshaies displayed a weapon as he approached Powell's vehicle or that Officer

> Deshaies used any language or spoke in a tone of voice which mandated compliance.

*Id.* (citations and quotation marks omitted).[4]  The *Powell* court concluded that "under the circumstances, Officer Deshaies did *not* have to possess reasonable suspicion of wrongdoing in order to park behind or approach Powell's vehicle in order to ask Powell his purpose for being in the area." *Id.* (emphasis added).

[17]  Here, the officers did not activate their emergency lights or sirens.  They approached the vehicle on foot.  They did not display their weapons or approach the vehicle in an aggressive or intimidating manner.  Officers Helmer and Hammel asked the rear passengers their names.  There is no evidence that they used any language or spoke in a tone that would lead a reasonable person to conclude that they were not free to leave.  Therefore, the initial encounter between the officers and the vehicle occupants was consensual, and the officers did not need reasonable suspicion to approach the vehicle.[5]

[18]  Bailey asserts that when the officers removed the passengers from the vehicle for a patdown search, the officers lacked reasonable suspicion of criminal wrongdoing.  The State concedes, and we conclude, that when Officers Helmer

---

[4] *Powell* has an extensive list of federal and state cases that have concluded that a police officer's approach to a parked vehicle does not implicate the Fourth Amendment.  912 N.E.2d at 861-62.

[5] Although Officer Shipley parked his car somewhere behind the green vehicle, there is no evidence that he parked in a manner that blocked the green vehicle, and he arrived after the officers had already removed the backseat passengers from the vehicle.  Furthermore, Officer Deshaies also "pulled up behind" Powell's vehicle, but that fact standing alone did not lead the *Powell* court to conclude that Powell was subject to an investigatory stop.  912 N.E.2d at 862.

and Hammel removed the backseat passengers for a patdown search, the consensual encounter became an investigatory stop requiring reasonable suspicion. The State also concedes that when Officer Shipley removed Bailey from the passenger seat for a patdown search, he needed reasonable suspicion to do so.

> As another exception to the Fourth Amendment's warrant requirement, an officer may conduct a brief investigatory stop of an individual when, based on a totality of the circumstances, the officer has a reasonable, articulable suspicion that criminal activity is afoot. The investigatory stop, also known as a *Terry* stop, is a lesser intrusion on the person than an arrest and may include a request to see identification and inquiry necessary to confirm or dispel the officer's suspicions. Reasonable suspicion is determined on a case by case basis. The reasonable suspicion requirement is met where the facts known to the officer at the moment of the stop, together with the reasonable inferences from such facts, would cause an ordinarily prudent person to believe criminal activity has occurred or is about to occur.

*J.B.*, 30 N.E.3d at 55 (citations and quotation marks omitted).

[19] The facts known to the officers at the time that they removed the backseat passengers from the vehicle, as well as shortly thereafter when Officer Shipley removed Bailey, are that Officer Helmer knew that Coppertree had a history of theft from its laundry room coin machines. All three officers had responded to a report of three suspicious black males present at one of the laundry rooms, who could be breaking into one of the coin machines. The report included the observation that one of the men, who appeared to be acting as a lookout, was wearing a knit hat with a ball on it. Before the officers arrived at the scene, the

caller had updated her report, informing dispatch that the men were sitting in a green vehicle and providing the vehicle's license plate number. The officers saw that one of the passengers in the green vehicle had a stocking cap with a ball on it and that the vehicle's license number matched the reported license number.

[20] Bailey argues that these facts are insufficient to establish reasonable suspicion because "[w]hen the suspicion arises solely from the information of an anonymous tip, '… the tip must be corroborated by police and it must exhibit sufficient indicia of reliability.'" Appellant's Br. at 11 (quoting *Berry v. State*, 766 N.E.2d 805, 807 (Ind. Ct. App. 2002)). But this is not all the information that the officers had when they removed the men from the vehicle. Additional information became available to the officers, and we must consider the totality of the circumstances to determine whether the police had reasonable, articulate suspicion of criminal activity. *See J.B.*, 30 N.E.3d at 55.

[21] When Officers Helmer and Hammel asked the backseat passengers for their names, the passengers appeared nervous and avoided eye contact. We acknowledge that "[a] vague and general characterization of demeanor, such as 'nervousness,' does not rise to the level of reasonable suspicion." *Tumblin v. State*, 736 N.E.2d 317, 322-23 (Ind. Ct. App. 2000), *trans. denied*. But in this case there is more. Officer Helmer saw one of the passengers keep moving his left hand down around the seat under his body, and he refused to comply when

instructed to keep his hands visible and in his lap.[6] Summarizing the totality of the circumstances, we observe that Officer Helmer knew that Coppertree had a history of theft involving the laundry room machines, there had been a report of suspicious behavior and a possible theft from those machines, the vehicle and its license number fit the reported description, and one of the men was wearing a hat as described by the caller. In addition, the occupants were nervous and failed to make eye contact and one occupant refused to obey the officer's request to keep his hands visible. *All together*, these circumstances support a reasonable suspicion that the men in the vehicle had been involved in criminal activity, either theft or trespass.

[22] There was also reasonable suspicion that the men could be armed. "In addition to detainment, *Terry* permits a reasonable search for weapons for the protection of the police officer, where the officer has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." *Malone v. State*, 882 N.E.2d 784, 786-87 (Ind. Ct. App. 2008) (citing *Terry v. Ohio*, 392 U.S. 1, 27, (1968)). "Officer safety is of paramount importance. Police officers are daily placed in difficult and dangerous situations, some of which are life threatening. The law

---

[6] The State contends that "[w]hen the officers approached the green car, there is a reasonable inference that the two backseat passengers, whom Officer Helmer and Officer Hammel spoke with, failed to answer whether they lived at Coppertree." Appellee's Br. at 20. To the contrary, the record supports the conclusion that the passengers answered the officer's questions. Officer Helmer testified that the occupant of the rear passenger seat "answered his questions" and "was complaint." Tr. at 15, 16. Officer Hammel's testimony supports a strong inference that he did not ask the driver's-side rear passenger anything other than his name before he was compelled to begin directing the passenger to keep his hands visible and in his lap. *Id*. at 96.

has to provide protections for such officers." *Id*. at 787. Here, the occupants were nervous, failed to make eye contact, and one occupant refused to obey the officer's request to keep his hands visible. Thus, to ensure their own safety, the officers were permitted under the Fourth Amendment to remove the men, including Bailey, from the vehicle and pat them down for weapons.

Because we have determined that Bailey was constitutionally detained, his argument that the handgun is inadmissible because he abandoned it as a result of an unconstitutional seizure must fail. As such, we conclude that the trial court properly admitted the abandoned handgun.

## Section 2 – Bailey has failed to carry his burden to establish that his sentence is inappropriate.

Bailey argues that his fourteen-year executed sentence is inappropriate pursuant to Indiana Appellate Rule 7(B), which states, "The Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." When reviewing a sentence, our principal role is to leaven the outliers rather than necessarily achieve what is perceived as the correct result. *Cardwell*, 895 N.E.2d at 1225. "We do not look to determine if the sentence was appropriate; instead we look to make sure the sentence was not inappropriate." *Conley v. State*, 972 N.E.2d 864, 876 (Ind. 2012). "In assessing the nature of the offense and character of the offender, we may look to any factors appearing in the record." *Boling v. State*, 982 N.E.2d 1055, 1060 (Ind. Ct. App. 2013). "[S]entencing is principally a discretionary

function in which the trial court's judgment should receive considerable deference." *Cardwell v. State*, 895 N.E.2d 1219, 1222 (Ind. 2008). "Such deference should prevail unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character)." *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015). Bailey has the burden to show that his sentence is inappropriate. *Anglemyer v. State*, 868 N.E.2d 482, 494 (Ind. 2007), *clarified on reh'g*, 875 N.E.2d 218.

[25] Turning first to the nature of the offense, we observe that "the advisory sentence is the starting point the Legislature selected as appropriate for the crime committed." *Pierce v. State*, 949 N.E.2d 349, 352 (Ind. 2011). The sentencing range for a class B felony is six to twenty years with an advisory sentence of ten years. Ind. Code § 35-50-2-5. Bailey's fourteen-year sentence is above the advisory and above the State's recommended sentence of twelve years but below the statutory maximum.

[26] Bailey asserts that there was nothing about the nature of his offense that makes it more serious than the garden-variety unlawful possession of a firearm by a SVF. We disagree. As the State notes, "A garden-variety possession offense might involve, for example, having a handgun stored in one's car that is found during a search of the car." Appellee's Br. at 32 (citing *Hansbrough v. State*, 2016 WL 365182, No. 29A04-1508-CR-1121 (Ind. Ct. App. Jan. 29, 2016), *trans. denied*). Here, Bailey had actual possession of a fully loaded gun. He had a

round in the gun's chamber, so it was ready to fire. Bailey fled from law enforcement and raised the gun to shoulder level. Thus, he generated a situation that could have resulted in the shooting of a police officer or innocent bystander. The nature of his offense created a significant threat to public safety.

[27] As for Bailey's character, although he was twenty-five years old when he committed the instant offenses and twenty-seven years old at sentencing, he had three prior felonies and two prior misdemeanors. His felonies consist of class C felony burglary, class C felony battery committed by means of a deadly weapon or resulting in serious bodily injury, and class D felony theft. His crimes show a propensity for violence. He also has prior class A misdemeanor convictions for conversion, resisting law enforcement, and possession of marijuana. Further, Bailey committed the instant offenses while on parole for the battery conviction, just four months after being released from the Department of Correction. Bailey argues that even though his mother died when he was thirteen, he managed to graduate from high school and complete some college. Though laudable, as an adult, Bailey has persistently violated the law. We conclude that Bailey has failed to carry his burden to show that his sentence was inappropriate. Therefore, we affirm.

[28] Affirmed.

Najam, J., and Robb, J., concur.