# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 02 2017, 9:16 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Bernice A. N. Corley
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Caryn N. Szyper
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Jason Monohan, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff* | June 2, 2017 <br><br> Court of Appeals Case No. <br> 49A02-1611-CR-2649 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Sheila A. Carlisle, Judge <br><br> Trial Court Cause No. <br> 49G03-1608-F2-30649 |

**Vaidik, Chief Judge.**

# Case Summary

[1] Jason Monohan was convicted of robbery resulting in serious bodily injury, two counts of criminal confinement with a deadly weapon, and kidnapping. The trial court sentenced him to thirty years for the robbery conviction, ten years for each of the criminal confinement convictions, and five years for the kidnapping conviction. The trial court ordered the two criminal confinement sentences to run concurrent with one another but consecutive to the robbery and kidnapping sentences, for an aggregate term of forty-five years. Monohan was sentenced to a total of forty-five years, all executed in the Department of Correction (DOC).

[2] Monohan appeals, arguing that the evidence is insufficient to support his conviction for robbery resulting in serious bodily injury. He also argues that the trial court abused its discretion when it ordered him to serve ten years, instead of the advisory sentence of nine years, for his criminal-confinement convictions. Last, he argues that an aggregate sentence of forty-five years is inappropriate. Finding sufficient evidence and no issues with sentencing, we affirm.

# Facts and Procedural History

[3] Around 2:30 a.m. on the morning of August 1, 2016, Jessica Pfeil received a text message from Zachary Bolling's phone number. The text requested that Pfeil bring $400 to Bolling's house because Bolling's landlord had locked him out and he would not be let inside until he paid the landlord $400. Pfeil, who had recently started dating Bolling, texted back that she could not give Bolling

the money. She then received texts asking her to bring her iPad and phone to give to the landlord as collateral. Again, Pfeil said no, but she agreed to meet Bolling at his house and pick him up. Pfeil thought the texts were "slightly gibberish" and that they did not sound like Bolling because "it said that his parents were going to be called[,] and his dad [had] passed away." Tr. Vol. II p. 10.

[4] Pfeil arrived at the house around 3:00 a.m. and did not see Bolling outside the house, so she called him. Bolling told her that he had been allowed back inside and had just gotten out of the shower, but the front door was unlocked and she should come inside and wait for him to get dressed. The entire house was dark when Pfeil entered, so she began calling out for Bolling but did not get a response. She walked further into the house, yelling Bolling's name. Pfeil then saw a group of people she did not recognize standing in the kitchen—these individuals were later identified as Monohan, Michael Bennett, Katrina Grider, and Meg Thompson. Monohan had ordered the group to remain quiet when Pfeil entered the house and told Thompson and Grider to attack Pfeil. He also threatened Thompson, "if she screams, you're dead." *Id*. at 227.

[5] Pfeil turned and began running for the front door but was tackled by Grider and Thompson, who placed a towel over her mouth to prevent her from screaming. Bennett told Pfeil, "don't scream or I will kill you." *Id*. at 228. Grider and Thompson punched Pfeil multiple times in her back and legs. Pfeil tried to fight back but was unsuccessful. Bennett placed an object, which Pfeil believed was a gun, against the back of her head and said that if she did not stop fighting he

would kill her. Pfeil immediately stopped fighting and was escorted to the back bedroom of the house, where Bolling was tied up and sitting inside a closet, naked from the waist down.

Monohan, who had taken possession of Pfeil's car keys and cell phone, explained to her that the plan was to take $600 from her bank account and then let her go. He also said that after they had the money they were going to kill Bolling and stage it as an overdose. Fearing that Monohan would kill her if she did not comply, Pfeil gave him her debit card, her ATM PIN, and the code to unlock her cell phone. Before leaving the bedroom, the group kicked Bolling and called him a "piece of shit." *Id.* at 30. One kick was to Bolling's face and caused his nose to bleed. Monohan instructed Thompson to keep watch over Pfeil and Bolling and said, "[I]f they move, you know, kill them." *Id.* at 230. Thompson was given two knives by Bennett, who left with Monohan to go get money from Pfeil's account from an ATM. Monohan and Bennett were unsuccessful getting money from Pfeil's account and returned to the house. The sun was coming up at this point, so they decided to move Bolling and Pfeil to the basement.

Bolling, who was still naked from the waist down, was placed in a utility closet in the basement, and his original restraints of electrical tape and cords were replaced with zip ties. Pfeil was placed in the opposite corner of the basement and was also restrained with zip ties. Both Bolling and Pfeil had duct tape placed over their mouths. Monohan then left the house to try again to get

money from Pfeil's account. He was successful but could retrieve only $500 from the ATM because of Pfeil's withdrawal limit.

[8] Later that morning, believing that Pfeil was trying to make noise to alert anyone outside to her presence in the basement, Grider entered the basement and placed a gag in Pfeil's mouth and re-taped her mouth shut. Grider then punched Pfeil in the face, causing Pfeil to hit her head on the cinderblock wall. Grider rolled Pfeil onto a piece of carpeting covered in dog feces and kicked her until Pfeil blacked out. Sometime later, Bennett went down to the basement to notify Pfeil that they needed her to call the bank and increase her withdrawal limit. He saw that Pfeil's eye was swollen shut and that she was bleeding. Bennett was surprised to see that Pfeil was injured; he removed the duct tape, the gag, and the zip ties and brought her upstairs. Bennett showed Pfeil's injuries to Monohan, and Monohan was similarly surprised to see that she had been beaten. Monohan explained that "the deal was that after the initial jump, which was really just like a scare tactic," that Pfeil was not to be touched or injured in any way. *Id.* at 55-56. Pfeil identified Grider as her attacker.

[9] At some point, Anthony Doss came to the house and it was decided that Monohan, Bennett, Doss, and Pfeil would go to Pfeil's bank. Pfeil would then speak with a bank teller and withdraw $1000 from her account. To explain the injury to her eye, Monohan told her to say that she had gotten into a bad car accident. The plan was executed, including Pfeil explaining to the teller that she had been in a car accident and needed the money for repairs. *See* Ex. 8 (surveillance photo of Pfeil and Monohan speaking to a bank teller). Pfeil

withdrew $1000 from her account and gave it Monohan, and the foursome returned to Bolling's house.

[10] Eventually Pfeil was released from confinement, but Monohan refused to release Bolling, stating that he wanted to keep Bolling at the house and hurt him. Around 6:00 p.m., approximately fifteen hours after Pfeil arrived at Bolling's house, Bolling escaped from the basement and ran to a neighbor's house where he called 911. Shortly thereafter, police identified and arrested all parties that were involved. Monohan was charged with eight counts: Level 2 felony robbery resulting in serious bodily injury, two counts of Level 3 felony criminal confinement while armed with a deadly weapon—one count for Bolling and one for Pfeil, Level 5 felony criminal confinement with bodily injury, Level 3 felony kidnapping while armed with a deadly weapon, Level 5 felony kidnapping committed using a vehicle, Level 5 felony battery resulting in serious bodily injury, and Class A misdemeanor battery resulting in bodily injury. A two-day bench trial was held and Monohan was found guilty on all counts. Due to double-jeopardy concerns, the trial court vacated several of the convictions, leaving in place robbery resulting in serious bodily injury, both counts of Level 3 criminal confinement, and kidnapping committed using a vehicle.

[11] At sentencing, Pfeil read a victim impact statement in which she detailed the effects of her physical and psychological injuries: pain in her eye, numbness in her face, constant anxiety, and trouble feeling safe when alone. The State then argued that Monohan should be sentenced to fifty-two years, all executed at the

DOC. The State argued that multiple aggravating circumstances existed: Monohan's extensive criminal history—dating back to when he was fifteen years old; his offenses have become more violent over time; he received twelve misconduct violations while in the DOC for previous convictions; he was released from the DOC on May 10, 2016, not even three months before the events at issue in this case; and he was on pre-trial release for five pending cases when he committed the crimes against Bolling and Pfeil.

[12] The trial court found multiple mitigating and aggravating circumstances. Regarding the mitigating circumstances, the court accepted Monohan's genuine expression of remorse and found that he had a history of mental-health and substance-abuse issues. The court agreed with the State's list of aggravating circumstance and also found that Monohan had been given short-term sentences, probation, home detention, and a sentence at community corrections, all of which he failed. *See* Tr. Vol. II p. 104 ("So I see not only an increase in the violence that you've committed, I see an increase in the seriousness of your sentences, and the fact that you still have not rehabilitated yourself through the sentences that the court has given you. I don't know how many more opportunities for rehabilitation the Court could give you than what the courts already did through those different sentences that you received."). The trial court concluded that the aggravating circumstances far outweighed the mitigating circumstances and sentenced Monohan to thirty years for robbery resulting in serious bodily injury, concurrent sentences of ten years for the two

counts of criminal confinement, and five years for kidnapping, to be served consecutively for an aggregate term of forty-five years in the DOC.

[13]     Monohan now appeals.

# Discussion and Decision

[14]     Monohan raises three arguments on appeal. First, he argues that the evidence is insufficient to support his conviction for robbery resulting in serious bodily injury. Second, he contends that the court abused its discretion when it sentenced him a term of ten years for each of his criminal-confinement convictions, instead of the advisory sentence of nine years. Third, he argues that his aggregate sentence of forty-five years is inappropriate.

# I. Sufficiency of the Evidence

[15]     Monohan argues that the evidence is insufficient to support his conviction for robbery resulting in serious bodily injury. When reviewing the sufficiency of the evidence, we neither reweigh the evidence nor determine the credibility of witnesses; that role is reserved for the factfinder. *Bailey v. State*, 979 N.E.2d 133, 135 (Ind. 2012). "The evidence—even if conflicting—and all reasonable inferences drawn from it are viewed in a light most favorable to the conviction." *Id.* A conviction will be affirmed "if there is substantial evidence of probative value supporting each element of the crime from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." *Id.*

[16] Robbery occurs when a person "knowingly or intentionally takes property from another person or from the presence of another person: (1) by using or threatening the use of force on any person; or (2) by putting any person in fear . . . ." Ind. Code § 35-42-5-1. Robbery, as defined, is a Level 5 felony, but the crime is elevated to a Level 2 felony if it results in serious bodily injury to any person other than the defendant. *Id.* Monohan does not dispute that he committed robbery as a Level 5 felony, but he argues that he cannot be held liable for the serious-bodily-injury enhancement because Pfeil's injuries were not a natural and probable consequence of the robbery. We disagree.

[17] An individual who sets out with another or a group to accomplish a criminal act is legally responsible for his own actions as well as all actions taken by his companions which are the natural and probable consequence of the common plan, even if the action was not intended as part of the original design. *Griffin v. State*, 16 N.E.3d 997, 1003 (Ind. Ct. App. 2014); *see also Breaz v. State*, 214 Ind. 31, 13 N.E.2d 952, 953 (1938). The act of the companion must be done in furtherance of the common plan. *Breaz*, 13 N.E.2d at 953. It is not necessary that the evidence show the individual personally participated in the commission of each element of the crime because the act of one companion is imputed to all. *Griffin*, 16 N.E.3d at 1003.

[18] Here, the original plan was to get Pfeil to Bolling's house, subdue her, rob her, let her go, and then kill Bolling and make it look like an overdose. Monohan ordered Thompson and Grider to attack Pfeil when she entered Bolling's house, ordered that Bolling and Pfeil be bound and gagged, did not object when knives

were given to Thompson to guard Bolling and Pfeil, and did not object when others in the group made threats of physical violence to Pfeil including threats of killing her. Monohan even gave an order to kill Bolling or Pfeil if they moved. Tr. Vol. II p. 230 ("[I]f they move, you know, kill them."). Additionally, Monohan had Bolling and Pfeil moved to the basement to further conceal their presence in the house. Grider went to the basement because she thought she heard Pfeil making noises to alert anyone outside that she was in the basement. Grider attacked Pfeil to keep her from making additional noises and to conceal her presence in the basement. Given the violent undertone of the entire robbery and Grider's belief that she was helping hide Pfeil and Bolling, we conclude that there was sufficient evidence to show that Pfeil's injuries were a natural and probable consequence of the original plan. We therefore affirm Monohan's conviction for Level 2 felony robbery resulting in serious bodily injury.[1]

# II. Sentencing

[19] Monohan raises two arguments regarding his sentence. First, he contends that the trial court erred when it sentenced him to ten years on each of his criminal-

---

[1] Monohan also argues that he is not an accomplice with regards to Pfeil's injuries because he was not present in the house when Grider attacked Pfeil. *See Wright v. State*, 690 N.E.2d 1098, 1106 (Ind. 1997) (identifying four factors for the Court to balance in determining accomplice liability, including presence at the scene of the crime). Having concluded that Pfeil's injuries were the natural and probable consequence of the robbery, Monohan's presence during the attack is not necessary for him to be found liable as an accomplice. *See Mauricio v. State*, 476 N.E.2d 88 (Ind. 1985) (defendant convicted of felony murder where accomplice killed victim after defendant had already left scene).

confinement convictions instead of the advisory term of nine years. Second, Monohan claims that his aggregate sentence of forty-five years is inappropriate.

## A. Confinement Sentences

[20] Monohan contends that the trial court was required to sentence him to the advisory term of nine years on both of his criminal-confinement convictions. He relies on Indiana Code section 35-50-2-1.3(c), which states, in part:

> In imposing consecutive sentences for felony convictions that are not crimes of violence (as defined in IC 35-50-1-2(a)) arising out of an episode of criminal conduct, in accordance with IC 35-50-1-2 . . . a court is required to use the appropriate advisory sentence in imposing a consecutive sentence . . . .

[21] Monohan interprets this provision to mean that the trial court was required to impose the advisory sentence for his criminal-confinement convictions since it ordered those sentences to run consecutive to his other sentences. But Section 35-50-2-1.3(c) is merely a reference to a former version of Section 35-50-1-2(c), which capped the consecutive sentences for an episode of non-violent criminal conduct at "the **advisory sentence** for a felony which is one (1) class of felony higher than the most serious of the felonies for which the person has been convicted." Ind. Code Ann. § 35-50-1-2(c) (West 2012) (emphasis added). Effective July 1, 2015, the statute was amended and no longer refers to advisory sentences. Instead, Section 35-50-1-2(c) states that the consecutive sentence for an episode of non-violent criminal conduct "shall not exceed the period described in subsection (d)." P.L. 238-2015 § 16. The language of Section 35-

50-2-1.3(c) that Monohan relies upon has been rendered obsolete by the current wording of Section 35-50-1-2(c).[2]

[22] Furthermore, in *Robertson v. State*, 871 N.E.2d 280, 285-86 (Ind. 2009), our Supreme Court made clear that subsection 1.3(c) "was not meant to impose additional restrictions on a trial court's ability to impose consecutive sentences" as outlined in Section 35-50-1-2(c). Monohan's reliance on subsection 1.3(c) is misplaced, and the trial court did not err when it sentenced Monohan to ten years on each count of criminal confinement.

## B. Appropriateness

[23] Monohan's final argument is that his aggregate sentence of forty-five years is inappropriate in light of the nature of his offenses and his character. This Court "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the defendant." Ind. Appellate Rule 7(B).

[24] "The principal role of appellate review should be to attempt to leaven the outliers . . . but not to achieve a perceived 'correct' result in each case." *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008). "[W]hether we regard a sentence as appropriate at the end of the day turns on our sense of the

---

[2] We encourage our legislature to amend Section 35-50-2-1.3(c) to prevent further confusion.

culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Id.* at 1224. "The circumstances do, however, bear on whether consecutive sentences are appropriate. Whether the counts involve one or multiple victims is highly relevant to the decision to impose consecutive sentences if for no other reason than to preserve the potential deterrence of subsequent offenses." *Id.* at 1225.

[25] Regarding the nature of the offenses, Monohan orchestrated a plan to get Pfeil to Bolling's house, oversaw the majority of the group's actions concerning Pfeil and Bolling, personally withdrew funds from Pfeil's account, and took an injured Pfeil to the bank so he could obtain more money from her account. Additionally, Monohan and other members of the group made repeated threats of violence to Pfeil including death threats, kicked and hit Bolling on multiple occasions, and kept Pfeil and Bolling confined for fifteen hours. Pfeil provided the court with a victim impact statement that detailed the on-going effects she has had to deal with, both physically and psychologically, because of her time with Monohan.

[26] The trial court also found multiple aggravating factors regarding Monohan's character. Since he was fifteen years old, Monohan has been committing crimes, which are becoming more violent over time. Monohan has also failed short-term sentences, probation, home detention, and a sentence at community corrections. He was released from the DOC less than three months before committing these offenses. Given the nature of these crimes, including that multiple victims were involved, and Monohan's character, we conclude the trial

court's aggregate sentence of forty-five years, all executed in the DOC, is not inappropriate.

[27] Affirmed.

Bailey, J., and Robb, J., concur.